Douglas R. Thorn (CA Bar No. 133521)
THORN LAW FIRM
Olympus Corporate Center
3017 Douglas Boulevard, Suite 300
Roseville, California 95661
Telephone – (916) 768-9311
Email – doug@thornlawfirm.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sonny Martinez; Jessica Martinez, individually and as the mother and Guardian Ad Litem for minors VJM, GRM, ARM, and EVM; and Joann Ramirez, | Case No. |
| | COMPLAINT AND DEMAND FOR JURY TRIAL |
| Plaintiffs, | |
| v. | |
| City of West Sacramento; West Sacramento Police Department; Jason M. Winger; David M. Stallions; Michael Duggins; Kenneth E. Fellows; Carl J. Crouch; Eric M. Palmer; Matthew S. Luiz; Louis Cameron; West Sacramento Doe 1 through 25; City of Stockton; Stockton Police Department; Dan T. Zwicky; Stockton Doe 26 through 50; Rafael Altamirano; and Doe 51 through 100, | |
| Defendants. | |

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial and allege:

**JURISDICTION AND VENUE**

1.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States and is brought under 42 U.S.C. § 1983 to redress the deprivation of the plaintiffs' constitutional rights under color of state law.

2.      This Court has civil rights jurisdiction under 28 U.S.C. § 1343 because this case is brought under 42 U.S.C. § 1983 to redress the deprivation of the plaintiffs' constitutional rights under color of state law.

3.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367 because the plaintiffs' state law claims are so related to their claims within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution of the United States.

4.      Venue lies in this judicial district under 28 U.S.C. § 1391(b)(1) because every defendant resides in this judicial district.

5.      Venue lies in this judicial district under 28 U.S.C. § 1391(b)(2) because all of the events and omissions giving rise to the plaintiffs' claims occurred in San Joaquin and Yolo counties in this judicial district.

6.      Intra-district venue lies in Sacramento under Local Rule 120(d) because this case arose in San Joaquin and Yolo counties.

**GOVERNMENT CLAIM**

7.      Plaintiffs timely complied with the California Government Claims Act before they filed this Complaint.

**NATURE OF THE CASE**

8.      This case arises out of the false arrest, unconstitutional detention, and malicious prosecution of plaintiff Sonny Martinez and the unconstitutional abuse of his family.  It is a frightful story of an innocent husband, father, son, and family

1  patriarch who was jailed, prosecuted, and nearly sent to prison for life for a crime he

2  did not commit, and the unconstitutional tactics the defendants used to carry out

3  their plans for the plaintiffs.

4        The defendants are scofflaws.  The nature and scope of their malice, oppression,

5  and fraud is *shocking*. Among other things, they conspired to deprive the plaintiffs of

6  their civil rights; fabricated, withheld, suppressed, and tampered with evidence,

7  including exculpatory and impeachment evidence;  falsified official reports and

8  records; engaged in judicial deception to obtain warrants illegally; conducted searches

9  and seizures without warrants or probable cause; made arrests without warrants or

10  probable cause; pointed loaded guns at men, women, and very young children who

11  were unarmed and posed no threat of any kind to the gunmen; destroyed,

12  disassembled, and converted illegally seized property to punish the plaintiffs without

13  due process; sicced the victim's family on the plaintiffs to punish the plaintiffs without

14  due process and put plaintiffs in fear of retaliation; and intentionally put plaintiff

15  Sonny Martinez in jail and kept him there when they knew was innocent.

16        The conspiracy to deprive the plaintiffs of their civil rights hatched during the

17  investigation of a shooting the defendants could not solve.  On Saturday, October 24,

18  2015, at around 8:50 p.m., 13-year old Alize Valadez was shot in the head at her

19  grandmother's house at 901 Solano Street in West Sacramento. The only eyewitness

20  (EW1) to the shooting told the defendants before they arrested Mr. Martinez or

21  applied for any warrants that: EWE was outside smoking a cigarette when the

22  shooting occurred; EW1 observed a black or dark-colored car driving south on Solano

23  Street and someone fire five gunshots from inside the car; after the shooting, EW1

24  watched the black or dark-colored car continue south on Solano Street to the

25  intersection of Solano Street and Sacramento Avenue; EW1 watched as the dark-

26  colored car turned west on Sacramento Avenue and drove off toward the interstate.

27  EW1 was certain the vehicle involved in the crime was a dark-colored car, and told

28  defendant Palmer he was sure the vehicle was a car.

But evidence was of no interest to the defendants.  The lead detective admitted to Mr. Martinez that, "I care about that little girl right there (pointing to picture of the victim), that little girl right there *is all I care about*."  The plaintiffs' rights were of no concerns to the defendants, and neither were the constitution and laws of the land. The defendants conducted their "policing" based on conjecture, assumptions, biases, feelings, beliefs, rumors, and huge egos and ended up victimizing the plaintiffs. They arrested, jailed, and charged Mr. Martinez, who they referred to as a non-human "piece of shit," with the shooting and other crimes and enhancements without probable cause and in deliberate disregard of the truth.  There was not even a tiny crumb of evidence implicating Mr. Martinez in the crime – zip, zero, zilch, nothing – and the proverbial mountain of exculpatory evidence exonerating Mr. Martinez from involvement in the crime. There was no gunshot residue on his clothes; no gunshot residue in his truck; no dark colored car; no gun; no ammunition; no DNA; no fingerprints; no eyewitness identification; no text messages; no telephone calls; no confessions; no secret recordings; no GPS waypoints; no nothing – zip, zero, zilch, nothing. And there was, among many other exculpatory items of evidence, the cell phone records to prove Mr. Martinez was in Stockton when the crime occurred and cell phone records that proved he never called informant Altamirano like the falsified police reports and probable cause affidavits presented to the magistrate claim. The defendants jailed Mr. Martinez and tried to send him to prison for life without any regard for his rights or the rights of his family.

The nightmare the plaintiffs endured will never go away.  It will always be with them, etched into their minds.  The plaintiffs will always remember the defendants assaults and humiliation; they will always remember the defendants breaking down the door of their home and the raw fear of having masked gunman rush into the house yelling at the top of their lungs while pointing automatic rifles at the family; they will always remember October 27, 2015, and each and every second, minute, hour, day, week, and month between October 27, 2015 and December 18,

00010014.docx

2015, when Mr. Martinez sat in solitary confinement in the Yolo County jail as an innocent man facing life in prison and wondering if he will ever get to hug his wife and kids again and be there for them as a father, husband, and son. And Ms. Martinez and the Martinez children endured similar fates.  Nor will the plaintiffs ever forget the fright, tension, and anxiety they endured for months after Mr. Martinez was released from jail while defendants were threatening to re-arrest him even though they knew he was innocent. The defendants should never again be in the position of power and authority to maliciously oppress people in the community like they maliciously oppressed the plaintiffs in this case; the defendants' felony antics are the very reason the People have lost confidence in the police and the criminal justice system, and their criminal misconduct in this case should raise red flags in all of their other cases. It is reasonable to worry that there are other innocent men and women in prison or with felony records because of similar misconduct by these defendants.

The plaintiffs seek compensatory damages for the deprivation of their rights, and for their fear, anxiety, sorrow, suffering, bereavement, mental anguish, emotional distress, misery, economic losses, medical expenses, travel expenses, harassment, oppression, and other harm and damages they suffered; the plaintiffs seek punitive damages against each individual defendant to not only punish him for his malice, oppression, fraud, and other despicable misconduct, but to send a loud and clear message to other police officers, prosecutors, and government supervisors that corruption brings financial hardship; they seek treble damages under the state civil rights laws; and the plaintiffs seek prejudgment interest, costs, attorney fees, and all other relief the court deems just in this case.

## PARTIES

### The Martinez Family

9.    Plaintiffs Sonny Martinez ("Sonny") and Jessica Martinez ("Jessica") are married and have four minor children. Their daughter, VJM, and son, GRM, are 14-years of age and paternal twins. Their son, ARM, is 3-years of age, and their son,

COMPLAINT AND DEMAND FOR JURY TRIAL

00010014.docx

EVM, is 2-years of age.  They are all citizens of the United States and the state of California and reside in this judicial district. Plaintiff Joann Ramirez ("Joann") is Sonny's biological mother, Jessica's mother-in-law, and the grandmother of VJM, GRM, ARM, and EVM. She is a citizen of the United States and the state of California and resides in this judicial district. The plaintiffs are referred to by their first name for brevity and clarity.

**City of West Sacramento Defendants**

10.    The City of West Sacramento is a public entity in Yolo County in this judicial district.

11.    The West Sacramento Police Department is a public entity in the City of West Sacramento in this judicial district.

12.    Defendants Duggins, Cameron, Luiz, Palmer, Stallions, Fellows, Winger, and Crouch are (or were at the times relevant to this case) agents and employees of the City of West Sacramento and the West Sacramento Police Department; they are all being sued in their individual capacities only.

13.    Doe 1 through Doe 25 are (or were at the times relevant to this case) agents or employees of the City of West Sacramento or the West Sacramento Police Department or both.  They reside in this judical dsitrict and are one or more of the following: (a) an individual who was responsible for supervising one or more defendants; (b) an individual who was responsible for training one or more defendants; (c) an individual who made (or makes) policy for a public entity defendant, or whose edicts may failry be said to represent official policy of one or more public entity; or (d) an individual who is responsible in some manner for the deprivation of the plaintiffs' civil rights as an individual or co-conspirator with the other defendants.

**City of Stockton Defendants**

14.    The City of Stockton is a public entity located in San Joaquin county in this judicial district.

00010014.docx

15.     The Stockton Police Department is a public entity in the City of Stockton in this judicial district.

16.     Defendant Zwicky is (or was at the times relevant to this case) an agent and employee the City of Stockton or the Stockton Police Department or both.  He resides in this judicial district and is being sued in his individual capacity only.

17.     Doe 26 through 50 are (or were at the times relevant to this case) agents and employees of the City of Stockton or  Stockton Police Department or both. They reside in this judical dsitrict and are one or more of the following: (a) the individuals who were responsible for supervising one or more of the Stockton defendants; (b) the individuals responsible for training one or more of the Stockton defendants; (c) an individual who made (or makes) policy for a public entity defendant, or whose edicts may failry be said to represent official policy of one or more public entity; or (d) an individual who is responsible in some manner for the deprivation of the plaintiffs' civil rights as an individual or co-conspirator with the other defendants, including the members of the SWAT team and other Stockton Police Deaprtment employees who authorized, supervised, mand particaptied in the operation at the house on Stonewall Court on Minday, October 26, 2015.

**Paid Police Informant Rafael Altamirano**

18.     Defendant Rafael Altamirano is a paid or compensated police inforamnt who resides in this judical dsitrict.  He consipred with the other individual defendants to depirve the plainitffs of their civil rights under color of state law.

**Additional Doe Defendants and Doe Allegations**

19.     Doe 51 through Doe 100 are (or was at the times relevant to this case) private individuals or agents and employees of one or more of the public entity defendants. They reside in this judicial district and are responsible in some manner for the deprivation of the plaintiffs' civil rights as an individual or co-conspirator with the other defednats.

COMPLAINT AND DEMAND FOR JURY TRIAL

20.     Plaintiffs do not know the true names, ranks, titles, job duties, or capacities of the defendants sued by a fictitious name because Plaintiffs do not have access to the information without discovery. But they believe that each defendant sued by a fictitious name is responsible in some manner for the deprivation of their civil rights under color of state law and will amend this Complaint after they obtain the information to make the amendments.

**Conspiracy**

21.     All of the individual defendants conspired to deprived the plaintiffs of their civil rights while acting under color of state law in the scope of their agency or employment.  Each individual defendant knew and understood the essential scope of the agreeemnt and plan was to work together like partners to deprive the plaintiffs of their civil rights by doing the affirmative acts, or participating in the affirmative acts of the others, or omitting to perform a legally required act, or comitting a lawful act by unlawful means; and each defendant, acting under color of state law in the course and scope of their agency or employment in furtherance of the conspiracy, met, talked, collaborated, planned, advised, approved, assisted, ratified, supressed, concealed, mislead, fabricated, tamprered with, and traveled upon roads, bridges, and highways to do the affirmative acts, or participate in the affirmative acts of the others, or omitt to perform legally required acts that resulted in the deprivation, under color of state law, of plaintiffs rights under the Constitution, laws, and treaties of the United States. The conspiracy was formed and carried out in whole or in part using instrumentalities or facilites of interstate commerce that incldued the telephone wires, internet, email, mail, wire, cellualr transmissions, streets, highways, bridges, and other facilites and channels of interstate commerce or that facilitate interstate commerce.

00010014.docx

## FIRST CLAIM FOR RELIEF

### (Fourth Amendment)

22.    Plaintiffs incorporate the allegations in paragraphs 1 through 21 into this claim for relief.

23.    On information and belief, the individual defendants conformed their conduct in whole or part to the official customs, policies, or practices of their public entity employers, and in whole or in part to their training.

**August 20, 2015**

24.    On August 20, 2015, Sonny, Jessica, ARM, and EVM moved into unit #8 of a 10-unit housing complex at 2606 South Harrison Street in Stockton (the "housing complex") with Sonny's cousin.

25.    Defendant Altamirano lived in unit #10 of the housing complex during the entire time the plaintiffs lived in unit #8 of the housing complex, and on information and belief has never moved from unit #10 of the housing complex.

26.    Altamirano was friends with Sonny's cousin, Stephanie, and her boyfriend, Chewey.

27.    A woman by the first name of Bonnie owns the housing complex. Sonny and Bonnie hit it off right away, and Bonnie asked Sonny to do the maintenance work at the housing complex. She also asked Sonny to complete several larger repairs and maintenance jobs in units #1, #2, #7, #8, #10, and #11.   Bonnie gave Sonny's cell phone number to the tenants of the housing complex, and told the tenants of the housing complex to call Sonny when they needed maintenance.  She also gave Sonny a key to the large storage shed on the property where she stored maintenance supplies, spare parts, and hand tools.

**September 15, 2015 to October 23, 2015**

28.    Sonny did not meet Altamirano until around mid-September 2015, some three to four weeks after the plaintiffs moved into the housing complex.

29.     Altamirano walked over to where Sonny was working on his truck and introduced himself to Sonny.  He told Sonny he repaired and detailed cars for a living. Sonny told Altamirano that Bonnie asked him to do the maintenance work around the housing complex, and that she asked him to do several jobs in Altamirano's unit. The news upset Altamirano.  He brusquely said he had been trying to get that maintenance job for a long time and turned around and walked back to his unit without saying another word to Sonny.

30.     Sonny was warned not to leave tools and other things of value in his truck or lying around because there were a lot of thefts at the housing complex and Altamirano was the suspected thief. Another person told Sonny that he knew Altamirano was a "snitch" who solicited a large drug buy so he could tell the police about the transaction to collect money or get out of some trouble he was in or both. Altamirano also owed money to some Sureños street gang members who showed up at the housing complex with guns about 6 or 8 or more times looking for Altamirano while the plaintiffs lived in the housing complex.  Most or all of the tenants in the housing complex were witness to these armed encounters at one time or another and very likely heard the gunshots fired outside of Altamirano's unit when he did not answer the door.

31.     Sonny and Jessica overheard one of the armed confrontations between the Sureños and Altamirano's wife through their open bedroom window, and seen two officers from the Stockton Police Department taking a report from Altamirano and his wife about the armed confrontation that night.   When Altamirano came over to talk to Sonny the next day, Sonny asked him about the incident.  Altamirano was obviously very scared and asked Sonny to "please post-up bro bro." The term post-up means to take up arms and guard Altamirano from harm from the Sureños when they returned, but Sonny told Altamirano "hell no" and that he was "loco" if he was thinking about going to war with the Sureños. Sonny wrote the request off to the crazy talk of a methamphetamine addict.  Undeterred, Altamirano asked Sonny

COMPLAINT AND DEMAND FOR JURY TRIAL

where he could buy a gun, and Sonny told him at the gun store, which upset Altamirano. Altamirano then turned and walked away without say anything else to Sonny, as he as obviously mad.  But the next day, Altamirano drove up in his van and motioned for Sonny to come over and talk.  When Sonny reached the passenger side window of the van, he seen a sawed off shotgun in the passenger seat and glass pipe and small baggie containing whitish crystals in plain view on the console of the van. In his typically cocky manner, Altamirano motioned at the sawed-off shotgun and said, "That's [nodding at the shotgun] is for the scraps [Sureños];" Altamirano then reached down to his right side and pulled out two strange looking objects from behind the console and smirked and said "these too," meaning the objects were for the Sureños.  Altamirano asked Sonny if he knew anyone who wanted to buy some "grenades" as he held up the objects. Sonny said, "Hell No, I'm cool" as he began quickly backing away from the van.  Altamirano said something that Sonny could not understand and sped off, leaving Sonny in the dust. Sonny went back to his unit in shock that Altamirano by what Altamirano was contemplating.

32. Altamirano is a convicted felon.

33. Altamirano has a lengthy criminal record.

34. Altamirano has been convicted of drug offenses.

35. Altamirano has been convicted of one or more counts of embezzlement.

36. Altamirano has been convicted of one or more counts of first degree burglary.

37. Altamirano has been charged with second degree burglary and drug offenses, and the second degree burglary charge was disposed of on the drug charges.

38. Altamirano has been convicted of one or more counts of petty theft.

39. Embezzlement, burglary, and petty theft are crimes involving moral turpitude.

40. Altamirano buys, sells, trades, makes and possesses illegal firearms, like the sawed off shotgun he showed off to Sonny.

41.   Altamirano buys, sells, trades, makes and possesses improvised explosive devices like the ones he showed off to Sonny.

42.   On information and belief, Altamirano has solicited and arranged to buy drugs from a person and then sold the information about the transaction to the police for money or other consideration.

43.   On information and belief, on or around October 3, 2015, Altamirano was arrested for petty theft, weapons charges, drug charges, or charges related to the improvised explosive devices he showed off to Sonny, and sought leniency in that case(s) in exchange for information.

44.   Altamirano defrauded Bonnie, an elderly woman who is over 65-years old, by soliciting money from her to buy security cameras for the housing complex. Altamirano told Bonnie he could get her a great deal on some security cameras someone he knew was selling for $475.00.   Bonnie gave Altamirano $475.00 to purchase the security cameras, but Altamirano kept her money and never delivered the security cameras.

45.   Altamirano was addicted to methamphetamine in October 2015.

46.   Altamirano used methamphetamine regularly while the plaintiffs were living in unit #8 of the housing complex.

47.   Altamirano could be frequently observed sitting in his car in the parking lot of the housing complex where he lives smoking methamphetamine.

48.   Altamirano owed money to the Sureños for drugs in October 2105, but could not pay the debt.

49.   Altamirano was under financial pressure in October 2015.

50.   Altamirano disliked Sonny because Sonny would not befriend Altamirano.

51.   Altamirano was angry at Sonny because Sonny would not take up arms to defend Altamirano from the Sureños.

52.     On information and belief, the defendants rewarded and encouraged Altamirano to fabricate evidence and make statements under oath or threat of criminal prosecution that they knew or should have known were fabricated.

53.     Altamirano also began annoying Sonny with text messages and telephone calls, and would regularly interrupt Sonny while he was working. Sonny thought Altamirano was a loner with no friends who was looking for someone to befriend. Altamirano would regulalry text or call Sonny five or more times a day; he would want to discuss the work Sonny was going to do in his unit, or car detailing tips Sonny gave him, or ask Sonny to put his cousin on the phone because she had no telephone of her own. There were even a few days when Altamirnao called or texted Sonny a dozen or more times.

54.     Sonny was always nice to Altamirano, but finally got so tired of Altamirano texting and calling him that he asked Altamirano to stop calling and stop texting; Sonny did not want anything to do with Altamirano outside of the repairs and maintenance to Altamirano's unit.  In addition to the illegal gun and grenades, Sonny knew Altamirano was a heavy drug user; he had seen drugs and drug paraphernalia in Altamirano's cars several times and knew from Altamirano's behavior that Altamirano was often high on methamphetamine and acted irrationally. So again, Sonny made it very clear to Altamirano, in a nice way and more than once, that he was too busy with his work and family obligations to hang out with Altamirano and respond to all of his calls and texts.

**Week of October 19, 2015**

55.     The plaintiffs moved out of the housing complex during the latter part of the week of October 19, 2015 (they think it was on Thursday or Friday, but are not sure), and a couple of days later moved into a home with another of Sonny's cousins, Raymond Orosco, Jr., on Stonewall Court in Stockton. Ray and his longtime girlfriend were splitting and Ray needed help moving his things to his new residence and to clean up the house to turn back to his girlfriend and her parents, who owned the

house.  Ray does not have a driver's license and does not drive or own a car. He relies on public transportation and friends and coworkers to get around. Sonny and Jessica planned to live at the house on Stonewall Court until they finished the work for Ray and then move back to Sacramento.

56.   Sonny's truck was used to move Ray's belongings to a duplex on Kelly Drive in Stockton where Ray lived after the breakup.

**Friday, October 23, 2015**

57.   Sonny and Jessica helped Ray cleanup, pack, and move his things to the house on Kelly Drive on Friday, October 23, 2015.

58.   On Friday, October 23, 2015 at 11:23 a.m., Altamirano used his cell phone – (209)-898-1336 – to send a text message to Sonny's cell phone – (916) 320-7392 – that reads, "*bro can u come outside pls,*" but Sonny ignored the text message; Altamirano did not know that the plaintiffs had already moved out of the housing complex.

59.   Altamirano did not see Sonny on Friday, October 23, 2015.

60.   Altamirano did not call Sonny on Friday, October 23, 2015.

61.   Altamirano did not speak to Sonny on Friday, October 23, 2015

62.   Sonny did not see Altamirano on Friday, October 23, 2015.

63.   Sonny did not call Altamirano on Friday, October 23, 2015.

64.   Sonny did not text Altamirano on Friday, October 23, 2015.

65.   Sonny did not speak to Altamirano on Friday, October 23, 2015.

66.   Sonny did not leave Stockton on Friday, October 23, 2015.

67.   Sonny's cell phone did not leave Stockton on Friday, October 23, 2015.

68.   Sonny's truck did not leave Stockton on Friday, October 23, 2015.

**Saturday, October 24, 2015**

69.   Sonny and Jessica helped Ray cleanup, pack, and move his things to the house on Kelley Drive on Saturday, October 24, 2015.

70.     At approximately 4:00 p.m. on Saturday, October 24, 2015, Sonny drove Ray to 8648 Kelly Drive in Stockton so that Ray could attend a barbecue with his new roomate and friends.  Sonny drove back to the house on Stonewall Court after he dropped Ray off.

71.     At 8:26 p.m. on Saturday, October 24, 2015, Sonny called his mother in Sacramento. He used his cell phone – (916) -320-7392 – to call his mother, Plaintiff Joann Ramirez, on her cell phone – (916) 584-2566.  Sprint usage records for Sonny's cell phone confirm that Sonny's cell phone was in Stockton for the 19-minute duration of the call. Joann's cell phone usage records corroborate the Sprint records, and confirm that Joann's cell phone was in Sacramento for the 19-minute duration of the call. The call between Sonny and Joann ended at 8:46 p.m., just about four or five minutes before Alize Valadez was shot.

72.     At approximately 8:50 p.m. on Saturday, October 24, 2015, 13-year old Alize Valadez was shot in the head.  She was at her grandmother's house at 901 Solano Street in West Sacramento when the shooting occurred.

73.     It is factually impossible to drive from the house on Stonewall Court in Stockton to the scene of the shooting on Solano Street in West Sacramento in five minutes.

74.     At 8:51 p.m. on Saturday, October 24, 2015, officers from defendant West Sacramento Police Department were dispatched to a 911 call from 901 Solano Street in West Sacramento.

75.     EW1, the only eyewitness to the shooting, was outside smoking a cigarette when the shooting occurred; EW1 watched a black or dark-colored car driving south on Solano Street as five gunshots were from inside the car; EW1 then watched the dark-colored car continue south on Solano Street before stopping at the intersection of Solano Street and Sacramento Avenue; EW1 then watched the dark-colored car turn west on Sacramento Avenue and drive off toward the freeway; EW1 was certain the vehicle involved in the crime was a dark colored passenger car.

00010014.docx

76.     The intersection of Solano Street and Sacramento Avenue in West Sacramento is well lit by a street light across from the intersection on the south side of Sacramento Avenue, and the abundant moonlight from the nearly full moon on the night of the shooting, which was clear.

77.     EW1's observations are corroborated by the evidence at the scene, including the trajectory analysis.

78.     At approximately 9:05 p.m. on Saturday, October 24, 2015, Sonny left the house on Stonewall Court to pick Ray up from the barbecue at the house on Kelley Drive.

79.     Sonny and Ray left the house on Kelly Drive drive about 9:15 p.m., and drove to the Walgreens at 3131 West Hammer Lane in Stockton.

80.     Ray and Sonny arrived at Walgreens at 3131 West Hammer Lane about 9:20 p.m., parked the truck, and walked into Walgreens to shop.

81.     Ray paid for their merchandise at 9:35 p.m., and Sonny and Ray drove back the house on Stonewall Court.

82.     Walgreens had security cameras in the store, and the security video footage from that store is kept for 60 days.

83.     The defendants did not ask for the security camera footage from Walgreens.

84.     There are numerus security cameras along the route Sonny traveled from the house on Stonewall Court to the house on Kelly Drive.

85.     The defendants did not ask for any of the security camera footage available from the security cameras along the route Sonny traveled between the house on Stonewall Court and house on Kelly Drive.

86.     Ray left the Walgreens receipt in the cab of Sonny's truck.

87.     On October 27, 2015, the defendants found the Walgreens receipt in the cab of Sonny's truck.

88.     Police conducted a trajectory analysis of the rounds fired into the house during the shooting.

89.     Police concluded that five rounds of .357 Magnum ammunition were fired into the house.

90.     Police could not determine from the evidence if the firearm used in the shooting was a handgun or rifle.

91.     A round of .357 Magnum ammunition fired from a rifle produces little or no visible flash at night at 100 yards.

92.     A round of .357 Magnum ammunition fired from a rifle equipped with a flash suppressor produces little or no visible flash at night at 100 yards.

93.     Police could not determine from the evidence if the firearm used in the shooting was equipped with a flash suppressor.

94.     Police could not determine from the evidence if the rounds were fired from a front seat or back seat of the car.

95.     At 11:52 p.m. on Saturday, October 24, 2015, just shortly after the regional nightly news broadcasts ended, Altamirano used his cell phone – (209)-898-1336 – to send a text message to Sonny's cell phone – (916) 320-7392 – that reads, "*I need u bro bro the scrAps [Sureños] came by dumping [shooting] right now pls. Call ME,*" but Sonny ignored the text message.  The word "scraps" is what Altamirano called the Sureños when he talked to Sonny, and the word "dumping" is what Altamirano used for the word shooting when he talked to Sonny.

96.     Altamirano did not see Sonny on Saturday, October 24, 2015.

97.     Altamirano did not call Sonny on Saturday, October 24, 2015.

98.     Altamirano did not speak to Sonny on Saturday, October 24, 2015

99.     Sonny did not see Altamirano on Saturday, October 24, 2015.

100.   Sonny did not call Altamirano on Saturday, October 24, 2015.

101.   Sonny did not text Altamirano on Saturday, October 24, 2015.

102.   Sonny did not speak to Altamirano on Saturday, October 24, 2015.

103. Sonny did not leave Stockton on Saturday, October 24, 2015.

104. Sonny's cell phone did not leave Stockton on Saturday, October 24, 2015.

105. Sonny's truck did not leave Stockton on Saturday, October 24, 2015

106. Sonny's cell phone was in Stockton when Alize Valadez was shot.

107. Sonny's truck was in Stockton when Alize Valadez was shot.

108. Sonny was in Stockton when Alize Valadez was shot.

109. Sonny did not shoot Alize Valadez.

**Sunday, October 25, 2015**

110. Local and regional media outlets continued to broadcast details of the Alize Valadez shooting during each news segment broadcast on Sunday, October 25, 2015.

111. On Sunday, October 25, 2015, at 11:49 p.m., Altamirano used his cell phone – (209)-898-1336 – to call Sonny's cell phone – (916) 320-7392 – but Sonny ignored the call.

112. Altamirano did not see Sonny on Sunday, October 25, 2015.

113. Altamirano did not speak to Sonny on Sunday, October 25, 2015.

114. Altamirano did not text Sonny on Sunday, October 25, 2015.

115. Sonny did not see Altamirano on Sunday, October 25, 2015.

116. Sonny did not speak to Altamirano on Sunday, October 25, 2015.

117. Sonny did not call Altamirano on Sunday, October 25, 2015.

118. Sonny did not text Altamirano on Sunday, October 25, 2015.

**Monday, October 26, 2015**

119. Local and regional media outlets continued to broadcast details of the Alize Valadez shooting during each news segment broadcast on Monday, October 26, 2015.

120. On Monday, October 26, 2015, defendants Zwicky met and talked with Altamirano.

121.   On Monday, October 26, 2015, defendant Zwicky called and talked to one or more of the individual defendants employed by the City of West Sacramento.

122.   The defendants claim at 09:07 a.m. on Monday, October 26, 2015, an anonymous male caller telephoned a tip into dispatch for the West Sacramento Police Deaprtment regarding the Alize Valadez shooting; they claim the caller said "on the night of the shooting he saw a 2006 Chevy Silverado white on top black on bottom, black rims, heavy set male driver with no one else seen in the vehicle." And claim "the anonymous male stated he saw 6-7 flash bangs and then took off heading north from the residence." The defendants did not disclose to Sonny or his public defender any recordings or printouts related to the anonymous call from the dispatch system for the West Sacramento police Department.

123.   At 9:15 a.m. on Monday, October 26, 2015,  Altamirano used his cell phone – (209)-898-1336 – to send another text message to Sonny's cell phone – (916) 320-7392 – that reads, "*bro bro can u call me pls,*" but Sonny ignored the text message.

124.   On Monday, October 26, 2015, Altamirano drove over to the house on Stonewall Court to locate Sonny.   Sonny was very surprised to see Altamirano and thought it should have been obvious to Altamirano than Sonny did not want anything to do with Altamirano.   But Sonny politely walked outside to the front passenger window of Altamirano's van to say hello to Altamirano. Altamirano was fidgeting with his phone and trembling and shaking like he was high on methamphetamine and he immediately asked Sonny, "*Hey, did you hear about that little girl in Sacramento that got hurt in that drive-by?*" But Sonny had not heard about the shooting and told Altamirano so.  Altamirano then said he had to leave and abruptly drove off, which Sonny chalked up to the bizarre behavior of a methamphetamine addict. And Sonny thought it would be the last time he would ever hear from Altamirano.

125.   On Monday, October 26, 2015, at approximately 1:07 p.m., defendant Palmer interviewed EW1 on the telephone; the interview was recorded.

COMPLAINT AND DEMAND FOR JURY TRIAL

126.   At 4:28 p.m. on Monday, October 26, 2015, at the request of one or more defendants and while one or more defendants was present and listening, Altamirano used his cell phone – (209)-898-1336 – to place a call to Sonny's cell phone – (916) 320-7392 – which Sonny ignored.

127.   At 4:41 p.m. on Monday, October 26, 2015, at the request of one or more defendants and while one or more defendants was present and observing, Altamirano used his cell phone – (209)-898-1336 – to send another text message to Sonny's cell phone – (916) 320-7392 –  that reads, "*can u come out bro pls*," which Sonny ignored.

128.   At 9:32 p.m., on Monday, October 26, 2015, at the request of one or more defendants and while one or more defendants was present and listening, Altamirano used his cell phone – (209)-898-1336 – to place another call to Sonny's cell phone – (916) 320-7392 – which Sonny ignored.

129.   Altamirano has not tried to contact Sonny since 9:32 p.m., on Monday, October 26, 2015.

130.   Sonny did not call Altamirano on Monday, October 26, 2015.

131.   Sonny did not text Altamirano on Monday, October 26, 2015.

132.   Sonny did not talk to Altamirano on the telephone on Monday, October 26, 2015.

133.   At approximately 11:50 p.m. on Monday, October 26, 2015, defendant Stallions applied for and obtained a warrant for Sonny's arrest in furtherance of the conspiracy.

134.   At approximately 1:20 a.m. on Tuesday, October 27, 2015, defendant Winger applied for and obtained a search warrant whose terms are set forth in the warrant in furtherance of the conspiracy.

135.   The defendants applied for and obtained a search warrant for the cell phone usage records for each cell phone they seized at the house on Stonewall Court in Stockton, including Sonny's cell phone.  The applications were in furtherance of the conspiracy.

136.   The defendants applied for and obtained a search warrant to install a GPS tracking device in the plaintiffs' white, 2003 Chevrolet Silverado truck in furtherance of the conspiracy.

137.   The defendants installed the GPS tracking device in the plaintiffs' white, 2003 Chevrolet Silverado truck without a warrant in furtherance of the conspiracy, and falsified evidence to cover up their misconduct.

138.   On information and belief, the probable cause affidavits presented to the magistrate to obtain the warrants also contain, in substance, the following representation:

> *On Monday, October 26, 2015 Sonny Martinez called Informant Rafael Altamirano and confessed to shooting Alize Valadez.*

138.1.      The representation is false.

138.2.      The representation was material to the determination of probable cause for the warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

138.3.      The defendants were trained to collect digital evidence from a cell phone, cell phone call log, and cell phone usage records before they met with Altamirano for the first time. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

138.4.      The defendants defined digital evidence from a cell phone in one or more of the search warrants as: "phone identification numbers, cellular call logs, text messages, photos, videos, audio files, attachments, emails, GPS locations, social networking data to include instant messages, emails, documents, internet history, photographs, videos, and data files stored on the cellular phone tending to

1  establish a suspect who committed the crime, identify additional witnesses, and

2  attempt to obtain additional evidence related to this case."

3      138.5.      The defendants met with Altaminrao before they applied

4  for any of the warrants or arrested Sonny. Every magistrate would want to have this

5  information when considering the defendants' applications for a warrant to arrest

6  Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003

7  Chevrolet Silverado truck.

8      138.6.      Altamirano's cell phone log was available to the defendants

9  before they applied for any of the warrants or arrested Sonny. Every magistrate

10 would want to have this information when considering the defendants' application

11 for a warrant to arrest Sonny. Every magistrate would want to have this information

12 when considering the defendants' applications for a warrant to arrest Sonny and

13 warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet

14 Silverado truck.

15     138.7.      Altamirano's cell phone usage records were available to the

16 defendants before they applied for any of the warrants or arrested Sonny. Every

17 magistrate would want to have this information when considering the defendants'

18 applications for a warrant to arrest Sonny and warrant to search the house on

19 Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

20     138.8.      The defendants reviewed Altamirano's cell phone call log

21 and cell phone usage records before they applied for any warrants or arrested Sonny.

22 Every magistrate would want to have this information when considering the

23 defendants' application for a warrant to arrest Sonny. Every magistrate would want

24 to have this information when considering the defendants' applications for a warrant

25 to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs'

26 2003 Chevrolet Silverado truck.

27     138.9.      Neither Altamirano's cell phone call log nor Altamirano's

28 cell phone usage records reflect any calls from Sonny's cell phone to Altamirano's cell

phone on Monday morning, October 25, 2015 or at any other time after the Alize Valadez shooting at 8:50 p.m. on Saturday, October 26, 2015. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

138.10.    The defendants conducted a Cellibrite analysis of Altamirano's cell phone before they applied for any warrants or arrested Sonny. Every magistrate would want to have this information when considering the defendants' application for a warrant to arrest Sonny. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

138.11.    The Cellibrite analysis the defendants conducted on Altamirano's cell phone before they applied for any warrants or arrested Sonny does not reflect any calls from Sonny's cell phone to Altamirano's cell phone on Monday morning, October 25, 2015 or at any other time after the Alize Valadez shooting at 8:50 p.m. on Saturday, October 26, 2015. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

138.12.    The SIM card extraction and analysis the defendants conducted on the SIM card from Altamirano's cell before they applied for any warrants or arrested Sonny does not reflect any calls from Sonny's cell phone to Altamirano's cell phone on Monday morning, October 25, 2015 or at any other time after the Alize Valadez shooting at 8:50 p.m. on Saturday, October 26, 2015. Every magistrate would want to have this information when considering the defendants' application for a warrant to arrest Sonny. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest

COMPLAINT AND DEMAND FOR JURY TRIAL

00010014.docx

1  Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003

2  Chevrolet Silverado truck.

3       138.13.    Other digital evidence from Altamirano's cell phone was

4  available to the defendants before they applied for any of the warrants or arrested

5  Sonny. Every magistrate would want to have this information when considering the

6  defendants' application for a warrant to arrest Sonny.

7       138.14.    The defendants knew if Sonny called Altamirano on

8  Monday morning, October 25, 2015, to confess to the crime like Altamirano claimed,

9  there would be a record of the call in Altamirano's cell phone call log and cell phone

10  usage records and a record of the call in Sonny's cell phone call log and cell phone

11  usage records. Every magistrate would want to have this information when

12  considering the defendants' application for a warrant to arrest Sonny.

13       138.15.    The defendants tried but failed to corroborate Altamirano's

14  claim about receiving a call on his cell phone from Sonny on his cell phone on the

15  morning of Monday, October 26, 2015. Every magistrate would want to have this

16  information when considering the defendants' applications for a warrant to arrest

17  Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003

18  Chevrolet Silverado truck.

19       138.16.    The defendants knew Sonny did not call Altamirano and

20  confess to the crime before they applied for any of the warrants or arrested Sonny.

21  Every magistrate would want to have this information when considering the

22  defendants' application for a warrant to arrest Sonny. Every magistrate would want

23  to have this information when considering the defendants' applications for a warrant

24  to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs'

25  2003 Chevrolet Silverado truck.

26       138.17.    The contradictions between what Altamirano told the

27  defendants and what the objective evidence from his cell phone log and cell phone

28  usage records provided to the defendants is material information every magistrate

would want to have when considering the defendants' application for a warrant to arrest Sonny. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

138.18.    The defendants knowingly and deliberately, or with reckless disregard for the truth, made the misrepresentation to the magistrate that created a falsehood in their applications for the warrants.

139.   On information and belief, the probable cause affidavits presented to the magistrate to obtain the warrants contain, in substance, the following representation:

> *The details of this crime was given to the media for broadcast. An anonymous tip came into dispatch (10-26-2015 at 0907 hrs) from a male stating on the night of the shooting he saw a truck matching the description of Sonny Martinez's truck being driven by a heavy set male driver matching the description of Sonny Martinez with no one else seen in the vehicle.  The caller said he saw 6-7 flashbangs and then took off heading north from the residence.*

139.1.    The representation is false.

139.2.    The representation was material to the determination of probable cause.

139.3.    The call was not anonymous. Every magistrate would want to have this information when considering the defendants' application for a warrant to arrest Sonny. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.4.    The automatic caller identification and automatic location identification features of the dispatch system in Yolo County identify the telephone number of the telephone being used to make the call regardless of the caller identification settings on the telephone (including cell phone numbers); the name of

the owner of the telephone number (including cell phone numbers); and the location or approximate location of the telephone. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.5.    The defendants knew the caller was unreliable because the information was inconsistent with the trajectory evidence at the scene that conclusively proves the vehicle involved in the crime was not an SUV or 2003-2006 Chevrolet Silverado truck but a car like EW1 told Palmer.  Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.6.    The defendants knew the caller was unreliable because the information was inconsistent with the eyewitness account of EW1, which is consistent with evidence at the scene. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.7.    The defendants knew the information the caller provided did not contain any indicia of reliability. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.8.    The caller's statement does not contain any information from which one might conclude the caller is honest or his information reliable. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

COMPLAINT AND DEMAND FOR JURY TRIAL

139.9.     The caller's statement does not contain any predictions of future behavior of a suspect. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.10.     The caller was not subject to arrest for making a false police report. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.11.     The fact the caller fled from the scene creates substantial doubt about the reliability of his statement. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.12.     The fact the caller waited nearly 48 hours after the crime was committed to call the police creates substantial doubt about the reliability of his statement. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.13.     The defendants were suspicious that the alleged anonymous call came into dispatch on the same morning that defendants claim Altamirano came forward with his claim to Zwicky. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.14.     A truck being driven by "a heavy set male" is not, by itself, a sufficient description to represent to the magistrate that the caller's information

matched the description of anyone. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.15.    The defendants knew that reliable height and weight information cannot be provided by a person who observed another person sitting in a vehicle at night. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.16.    If the caller provided more information to the defendants than just that the vehicle was being driven by a heavy set male, then that information was not provided to Sonny or his public defender.  Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.17.    The anonymous caller said the truck invovled in the crime was a 2006 model Chevrolet Silverado truck. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.18.    The plainitffs do not own a 2006 model Chevrolet Silverado truck. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.19.    The 2006 model year Chevrolet Silverado truck had a new body style that differentiate it from previous model years of the truck. Every magistrate would want to have this information when considering the defendants'

applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.20.    The caller said the truck invovled in the crime was white over black. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.21.    The plaintiffs truck was not white over black when the shooting ocurred. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.22.    The caller said the rims on the truck were black, but Altamirano told the defendants the rims on the plaintiffs' truck were chrome with some remnants of black paint. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.23.    There were inconsistencies between the anonymous caller's story and Altamirano's story are material to a determination of probable cause. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.24.    EW1 told the defendants he was certain the vehicle involved in the crime was a dark-colored car are material to a determination of probable cause. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

139.25.   The defendants knowingly and deliberately, or with reckless disregard for the truth, made the misrepresentation to the magistrate that created a falsehood in their applications for the warrants.

140.   On information and belief, the affidavits filed to obtain the warrants also contain the following misrepresentation to the magistrate:

*The shooting was gang related.*

140.1.   The defendants were speculating about a motive for the shooting. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

140.2.   The defendants did not have any evidence of a motive for the shooting. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

140.3.   The defendants did not have any evidence the shooting was gang related. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

140.4.   The defendants did not have any evidence that the shooting was for the benefit of any criminal street gang. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

140.5.   The defendants did not have any evidence that the shooting was at the direction of a criminal street gang. Every magistrate would want to have this information when considering the defendants' applications for a warrant to

00010014.docx

1   arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs'
2   2003 Chevrolet Silverado truck.

3        140.6.        The defendants did not have any evidence that the shooting
4   was in association with any criminal street gang. Every magistrate would want to
5   have this information when considering the defendants' applications for a warrant to
6   arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs'
7   2003 Chevrolet Silverado truck.

8        140.7.        The defendants did not have any evidence that the shooting
9   was done with the specific intent to promote any criminal conduct by gang members.
10  Every magistrate would want to have this information when considering the
11  defendants' applications for a warrant to arrest Sonny and warrant to search the
12  house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

13       140.8.        The defendants did not have any evidence that the shooting
14  was done with the specific intent to further any criminal conduct by gang members.
15  Every magistrate would want to have this information when considering the
16  defendants' applications for a warrant to arrest Sonny and warrant to search the
17  house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

18       140.9.        The defendants did not have any evidence that the shooting
19  was done with the specific intent to assist in any criminal conduct by gang members.
20  Every magistrate would want to have this information when considering the
21  defendants' applications for a warrant to arrest Sonny and warrant to search the
22  house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

23       140.10.       The defendants did not have any evidence that a gang
24  member perpetrated the crime. Every magistrate would want to have this
25  information when considering the defendants' application for a warrant to arrest
26  Sonny. Every magistrate would want to have this information when considering the
27  defendants' applications for a warrant to arrest Sonny and warrant to search the
28  house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

COMPLAINT AND DEMAND FOR JURY TRIAL

140.11.    The defendants are trained to know that every street gang member must have at least one tattoo representing his or her set or gang (e.g., "BRK" for Broderick Boys in West Sacramento), but more often has several tattoos representing his or her set or gang.  Sonny has no such tattoos. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

140.12.    Every prison gang member must have at least one tattoo representing his prison gang (e.g., "Nuestra Familia"), but more often than not has several tattoos representing his prison gang and his street gang. Sonny has no such tattoos. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

140.13.    Every member of the Nuestra Familia prison gang has at least one tattoo of "Nuestra Familia" or "N.F." or a picture of a sombrero resting on a dagger.  Sonny has no such tattoos. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

140.14.    The federal government documented the fact that Sonny was free of any gang affiliations, associations, or ties of any kind at any time between March 2007 and December 2012, and the defendants had no evidence – not a shred – that Sonny's status had changed after the federal government concluded its investigation and made its findings in December 2012. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

COMPLAINT AND DEMAND FOR JURY TRIAL

00010014.docx

140.15.    The defendants have been trained to know that being a member or former member or inactive member of a street gang is not a crime and is an association protected by the First Amendment absent a court order prohibiting the association, which does not exist regarding Sonny. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

140.16.    The defendants knowingly and deliberately, or with reckless disregard for the truth, made the misrepresentation to the magistrate that created a falsehood in their applications for the warrants and application to seal the warrants.

141.   On information and belief, the affidavits filed to obtain the warrants also contain the following misrepresentation to the magistrate:

> *If any information within the requested sealed portion of the Affidavit/Statement of Probable Cause Attachment A is made public, it will reveal or tend to reveal the identity of any confidential informant(s), impair further related investigations and endanger the life of the confidential informant(s).*

141.1.    The representations were false.

141.2.    The defendants did not have a related investigation pending when the representation was made. The lead detective admitted he had nothing, zip, zero, zilch, nothing to go on when Sonny was arrested.

141.3.     The defendants knew that if Altamirano was telling the truth about Sonny calling him to confess that Sonny would know who the informant was as soon as the defendants asked Sonny who he called about the crime. And the defendants knew that Altamirano's life was not in danger because they took no action to protect Altamirano from harm despite their knowledge that, if Altamirano was being truthful, Sonny would know he was the informant. Every magistrate would want to have this information when considering the defendants' applications for a

00010014.docx

warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.4.      Altamirano's still lives in unit #10 of the housing complex on South Harrison Street in Stockton, and has not lived anywhere else since Sonny was arrested.   Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.5.      The defendants knew that Altamirano's claim (and full statement to police) was the material to the prosecution's case in chief and Sonny's defense and under the *Brady* case they were required to give the evidence to Sonny's public defender. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.6.      The defendants knew that Altamirano's claim (and full statement to police) was impeachment material they were required to give to Sonny's public defender. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.7.      The defendants knew that Altamirano's claim regarding Sonny' alleged confession was material to Sonny's right to seek and obtain bail. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.8.      The defendants knew that Sonny had a right to have all of the ex-parte communications with the court bearing on the issue of bail. Every

00010014.docx

magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.9.     The defendants knew that Altamirano's claim regarding Sonny' alleged confession was material to Sonny's right to confront the witnesses against him in the criminal case. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.10.     The defendants took no action to protect Altamirano from retaliation. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.11.     Altamirano was rewarded or paid for the false information he provided to the defendants. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.12.     The application to seal the probable cause affidavits was made solely to cover up the defendants' illegal activates and deprive Sonny of his constitutional rights to confront the witnesses against him, obtain bail, and receive due process. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado truck.

141.13.     The application to seal the probable cause affidavits was not presented to the magistrate for the reasons given to the magistrate or the reasons authorized by law. Every magistrate would want to have this information when considering the defendants' applications for a warrant to arrest Sonny and warrant

COMPLAINT AND DEMAND FOR JURY TRIAL

00010014.docx

1  to search the house on Stonewall Court and the plaintiffs' 2003 Chevrolet Silverado
2  truck.

    141.14.   The defendants knowingly and deliberately, or with
4  reckless disregard for the truth, made the misrepresentation to the magistrate that
5  created a falsehood in their application to seal the probable cause affidavits.

142.  On information and belief, the probable cause affidavits contain other
7  material misrepresentations and omissions that make a substantial, truthful
8  showing to support a probable cause determination impossible and create a falsehood
9  in the applications for the warrants.

143.  Once the affidavits are re-written to comply with the law, there is not a
11  substantial basis for any magistrate to find probable cause.

144.  The defendants arrested Sonny for investigation purposes only in the
13  hope that something might turn up to assist them with the stalled investigation into
14  the shooting.

145.  Reasonably well-trained officers in the defendants' positions would have
16  known that complete and truthful warrant affidavits would not establish probable
17  cause and that he should not have applied for the warrants.

146.  Reasonably well-trained officers in the defendants' positions would have
19  known the arrest of plaintiff Sonny Martinez was illegal and that he should not have
20  arrested Sonny.

147.  The defendants did not have probable cause to conduct any of the
22  searches or property seizures they conducted, and each of those searches and seizures
23  were intentional and unreasonable.

148.  The search warrant obtained by Winger at approximately 1:20 a.m. on
25  Tuesday, October 27, 2015, was an overly broad general search warrant.

149.  Reasonably well trained officers in the defendants' positions would have
27  known the search warrant was an overly braid general search warrant and therefore
28  illegal and should not have been executed.

COMPLAINT AND DEMAND FOR JURY TRIAL

150.   The defendants did not search Sonny truck or its contents until after the truck and its contents were transported to the West Sacramento Police Department headquarters in West Sacramento.

151.   The defendants seized *everything* in Sonny's 2003 Chevrolet Silverado truck, including the following personal property that belonged to Sonny, Jessica, ARM, and EVM:

151.1.      Sonny's hand tools, power tools, an air compressor, an air brush, an engraving set, a jigsaw, Sonny's clothing, receipts, photographs, and perhaps other property.

151.2.      Jessica's 6 pair of women's pants, 4 pair of capris shorts, 8 tank tops, 10 shirts, 5 bras, 8 pair of underwear, 2 pair of sandals, 1 pair of tennis shoes, 1 toothbrush, 1 tube of toothpaste, 1 hairbrush, 1 hair strainer, 1 makeup bag (foundation, 2 cover-ups, 2 eyeshadows, 2 eyeliners, 1 blush), 1 fan, 1 iron, 2 pkgs. of maxi pads, 3 blankets, 4 pillows, and 2 sets of sheets, and perhaps other proeprty.

151.3.      ARM's 6 pair of pajamas, 10 pair of pants, 10 pair of shorts, 12 t-shirts, 8 tank tops, 5 pair of boxer shorts, 12 pair of socks, 1 pair of sandals, 1 pair of tennis shoes, 1 pair of slippers, 1 blanket, 1 pillow, 1 set of sheets, 1 Teddy Bear, 1 stuffed Batman, 4 toy cars, Lego set, 1 play phone, 1 toy piano, 1 Mickey Mouse laptop, and perhaps other property.

151.4.      EVM's 6 pair of pajamas, 10 pair of pants, 15 pair of shorts, 12 t-shirts, 8 tank tops, 12 pair socks, 1 pair of sandals, 1 pair of tennis shoes, 1 pillow, 1 blanket, 1 box of 92 count Pampers diapers, 1 550 count box of baby wipes, 1 Teddy Bear, 3 toy cars, 2 play telephones, 1 toy drum, 1 toy piano, and perhaps other property.

152.   Jessica objected to the seizure and asked defendants to let her have the items that belonged to her and ARM and EVM, but defendants refused and told her they were taking and searching everything in the truck.  Jessica told defendants she needed the property, so Defendants knew that by taking the items that belonged to Jessica, ARM, and EVM, they would create a hardship for Jessica, ARM, and EVM

00010014.docx

with nothing but the clothes on their back and facing a significant economic burden to replace the unlawfully seized items. The defendants would not even let Jessica get diapers out of the truck, so ARM and EVM spent between 5-7 hours in dirty diapers. The defendants took the plaintiffs property clothes to punish the plaintiffs.

153.  The defendants did not have probable cause to seize everything in Sonny's truck.

154.  The defendants did not have legal authority to conduct the search in West Sacramento.

155.  The defendants seized every cell phone, tablet, and electronic device of every person in the house Stonewall Court, including the cell phones belonging to Raymond Orosco, Jr. and Mr. McDonald. But the defendants did not have probable cause or a warrant to search or seize the cell phones or tablets or electronic devise belonging to Ray or Mr. McDonald or Ray's son or ex-girlfriend or anyone else other than Sonny Martinez.

156.  The defendants took an unreasonable amount of time to conduct the search of the house on Stonewall Court.

157.  The defendants did not prepare or serve returns for any of the search warrants, and did not provide Sonny or his public defender with a copy of any search warrant returns.  The defendants knew the search warrants returns were *Brady* material that was required to be turned over to Sonny or his public defender.

158.  The defendants served the unlawful search warrant for the house on Stonewall Court using military assault weapons and tactics and force that were unreasonable, excessive, and oppressive.

159.  Sonny and ARM (age 2) were fast asleep together on one couch in the living room next to the front door of the house, and Jessica (who is a very light sleeper) and EVM (age 1) were asleep together on the smaller love seat in the living room next to the front door of the house when the defendants broke down the front the door of the home without knocking or announcing their presence.

COMPLAINT AND DEMAND FOR JURY TRIAL

160.   The plaintiffs were sleeping when the paramilitary assault kicked off and they did not pose any threat to the defendants.

161.   The defendants' tactics for serving the warrants increased the risk and danger that the plaintiffs would be harmed, and put the safety of the officers above all other considerations, including the safety of the men, women, and very young children they knew were in the home.

162.   The defendants had plenty of opportunity to take Sonny into custody without incident without using force of any kind and without launching a paramilitary assault on the house on Stonewall Court and inflicting so much shock, fright, and other emotional harm on the occupants.

163.   The only danger was the grave danger and risk of harm the defendants created with their unreasonable choice of tactics and deliberate indifference to plaintiffs' rights under the Fourth and Fourteenth Amendments; none of the occupants of the house posed an immediate threat to the safety of the officers or others.

164.   The defendants who participated in the raid did not comply with the knock-announce-wait law, but instead smashed through the front door and charged into the residence wearing dark clothing, dark masks, and screaming words at the top of their lungs.

165.   When the defendants encountered the plaintiffs in the front room of the house:

165.1.   The plaintiffs were unarmed.

165.2.   The plaintiffs were waking to find masked gunmen in black clothing invading the house.

165.3.   The defendants were yelling loudly and yelling inconsistent instructions to the plaintiffs.  Some defendants were yelling, "FREEZE," and other defendants were yelling, "PUT YOUR HANDS UP."  Plaintiffs were in fear

of an imminent gunshot because they each had one of their young sons in their arms and could not comply with both commands.

165.4.     The defendants were armed with loaded assault rifles.

165.5.     The defendants were wearing black clothing and black ski-type masks to conceal their faces.

165.6.     The plaintiffs never threatened any of the defendants.

165.7.     None of the occupants actively resisted or attempted to flee.

165.8.     The defendants had more than 12 hours to consider their options for executing the arrest warrant for Sonny and search warrant for the house on Stonewall Court, and were not under time pressure to act.

165.9.     The defendants had a number of alternative methods, like arresting Sonny while he was outside and being surveilled or asking Sonny to come outside, or waiting for Sonny to come outside to work or run errands, or creating a ruse to lure Sonny out of the house.

165.10.    The defendants pointed their loaded assault rifles at the head and chest of Sonny and ARM, while Sonny and ARM were lying on the largest couch in the room helpless, passive, unarmed, and in fear for their lives. And they continued to point their assault rifles at Sonny and ARM until Sonny sat ARM down on the couch and was handcuffed.

165.11.    The defendants pointed their loaded assault rifles at the head and chest of Jessica and EVM, while they were lying on the smallest couch in the room helpless, passive, unarmed, and in fear for their lives. And they continued to point their assault rifles at Jessica and EVM until Jessica sat EVM down on the couch and was handcuffed.

165.12.    Defendants had been trained to know, and did know, that pointing an automatic assault rifle at passive, helpless, unarmed people at close range constitutes excessive force and violates the Fourth Amendment.

00010014.docx

165.13.      And it was obvious to all defendants that pointing an automatic assault rifle at one-year-old boy and two-year-old boy is blatantly unreasonable, excessive, and reckless.

165.14.      Sonny was ordered at gunpoint to set two-year-old ARM down on the couch and to turn around and put his hands behind his back; Sonny complied, and one of the defendants searched and handcuffed Sonny.

165.15.      Jessica was ordered at gunpoint to set one-year-old EVM down on the couch and to turn around and put her hands behind her back; Jessica complied, and one of the defendants searched and handcuffed Jessica.

166.   Sonny and Jessica repeatedly demanded to know what the defendants wanted, but were told to be quiet and someone would explain it to them later.

167.   Sonny repeatedly told the defendants that he was innocent of any wrongdoing.

168.   At one point, two defendants from the West Sacramento group of defendants came in the house and one of them asked Sonny his name; when Sonny told them who he was, the defendant said, "We got him."  Sonny said, "What do you mean you got him?  What did I do? I didn't do anything." But Sonny was once again told to be quiet and wait.

169.   Sonny and Jessica observed what they believe to be at least another 20 or more defendants at the scene participating in execution of the warrants.

170.   The armed defendants who entered the house disbursed throughout the house conducting the search.

171.   Raymond Orosco, Jr. was sleeping upstairs when the assault began.

172.   When Raymond started walking down the stairs with his hands held high above his head when he realized it was the police who invaded the house.

173.   As Raymond got about half the way down the stairs he was met by a defendant who was in full tactical gear and armed with an assault rifle.

174.   The defendant was pointing his assault rifle at Raymond's head and chest, and was trembling from fright.

175.   Raymond told the defendant to stop pointing the assault rifle at him because he was not resisting and was in fear of an imminent gunshot because the defendant was shaking from fear.

176.   Raymond kept his hands high above his head at all times to avoid being shot by the scared officer.

177.   The defendant got angry at Raymond for telling him to stop pointing his gun at Raymond and grabbed Raymond's shirt at the shoulder and tried to turn Raymond around and shove Raymond against the wall, but Raymond weighs over 300 lbs and cannot be moved that quickly or easily by anyone. The force was excessive, unreasonable, oppressive, and reckless, particularly since Raymond and the armed officer were on the stairs and not on level ground, and Raymond was not fully complying with the scared officer's orders.

178.   The defendant then began trying to pull Raymond down the stairs by his shirt, but Raymond was able to avoid falling and injuring himself by just walking down the steps in a bent fashion as the defendant was pulling him down the stairs by his shirt. The force was excessive, unreasonable, oppressive, and reckless, particularly since Raymond and the armed officer were on the stairs and not on level ground, and Raymond was not fully complying with the scared officer's orders.

179.   Once on level ground at the bottom of the stairs, Raymond was upset by the use of reckless and excessive force and told the defendant to stop, but the defendant told Raymond to shut up and slammed Raymond's head against the wall, causing Raymond to hit his face against the wall and break his eyeglasses.

180.   In addition to breaking the front door and door jamb, the defendants who executed the warrants also broke a sprinkle next to the front door, which was left spewing water through the front door and into the home for more than one hour before the water off to the entire property.

00010014.docx

181.  A substantial area extending into the home from the front door was flooded by defendants' recklessness indifference to the property rights of the occupants and owners, who would have to pay for the cleanup and repair of the broken front door and door jam, broken sprinkler, and the flooded wood flooring and carpeting.

182.  The defendants also pulled cabinets off the wall in the kitchen, broke cabinet doors and drawers, opened the attic access and just left it open when they left, pulled or tore an air vent right off the wall, broke fences in the back yard, tracked mud and dirt throughout the house and onto the carpet, threw clothing and property on the floor, and generally ransacked the house. The defendants were acting like thugs who could care less about other peoples' rights.

183.  The defendants seized property that was not listed in the search warrant.

184.  The search took longer than reasonably necessary.

185.  The defendants handcuffed Ray, Mr. McDonald, and Jessica for 2-3 hours or more.

186.  The defendants held Ray, Mr. McDonald, Jessica, ARM, and EVM in custody in handcuffs much longer than was reasonably necessary to complete the search.

187.  Jessica, EVM, and ARM were not the subjects of the investigation.

188.  The defendants seized Jessica, ARM, and EVM in their home without probable cause or a warrant.

189.  The defendants seized Jessica's property without probable cause or a warrant.

190.  The defendants seized ARM's property without probable cause or a warrant.

191.  The defendants seized EVM's property without probable cause or a warrant.

COMPLAINT AND DEMAND FOR JURY TRIAL

192.  The male defendant who ordered Jessica to put EVM down and turn around and put her hands behind her back sexually assaulted Jessica. The defendant walked up behind Jessica and began to use both of his hands to feel her body without her consent, without a warrant, and despite the fact that it was obvious she was not armed or resisting or posing any threat to the defendants; he humiliated Jessica in front of her husband as he used his hands to feel all around and between her breasts, her crotch, her buttocks, her inner thighs around her crotch, and around the full length of the rest of her arms and legs.  Jessica was then handcuffed and made to sit be Sonny near the table in the room while ARM and EVM remained alone on their respective couches and without their parents. ARM and EVM were hysterical and in obvious mental distress when they were forced to sit on the couch screaming and crying for mommy because all of the masked gunman crashed into the house yelling and screaming and threatening mommy and daddy. No reasonable officer would leave harmless little boys sitting by themselves and plainly suffering severe emotional distress. Such callousness is outrageous and oppressive.

193.  Jessica was separated from her babies and her property and was told she was not free to leave at least twice; She was tired, upset, and crying at times because her babies were crying and calling for her at times and she could not comfort them. Jessica was emotionally distraught at what was happening.

194.  The searches could have been completed in less than 1 hour with the number of defendants who were present to execute the warrant.

195.  Jessica was also held in custody while the defendants searched a second site on Kelley drive where Raymond's belongings had been moved.

196.  Jessica was told she eventually told she should make arrangements for someone to take care of her babies.  So Jessica called her sister-in-law, Angelica, and Angelica drove from Sacramento to the Stonewall Court house in Stockton and picked up ARM and EVM, who were still crying most of the time and who continued to cry all the way back to Sacramento because they wanted their mom.

197.  While she was siting handcuffed, one of the defendants asked Jessica why there was a picture of the, "Norteño bird" hanging on the wall, but the picture on the wall was not a "Norteño bird."  It was a picture of the United Farm Workers of America flag, which contains a picture of a Huelga bird or Aztec eagle.  The plaintiffs" family has a long and proud history of working the agricultural fields in California and Ray makes and sells wooden Huelga birds and UFW flags as his hobby.

198.  Jessica asked if she was free to leave with Angelica and he boys and was told she was not free to leave.  When Jessica asked why she was not free to leave, the defendant just told her she was not free to leave in an oppressive and malicious tone.

199.  Jessica was very tired, upset, and crying, but was not read her rights and still answered all of the questions asked of her to the best of her ability while she was in custody at the Stonewall Court location.

200.  Jessica was eventually released from custody after about 5-7 hours, perhaps more.

201.  When she was released from custody, one of the West Sacramento defendants asked her where she would be staying, and Jessica said she would be staying in Sacramento.  The West Sacramento defendants told her not to leave the state or country because they may need to come back and arrest her or ask her some more questions.

202.  After Jessica was released, she called Angelica to come pick her up and take her back to Sacramento to get her children.  She had no transportation because the defendants seized the truck, which was the only vehicle the family owned.

203.  Defendants used excessive force to conduct the searches, and were deliberately indifferent to the rights of others when they conducted the searches.

204.  The defendants ransacked the house and what clothes remained in the house; they broke the front door and front door jamb; they broke a sprinkler near the front door and flooded the first floor entrance, hall, and nearby carpeting; they broke cabinet doors and drawers; they threw property on the floor and walked all over the

00010014.docx

clothing; they took apart the inside of Sonny truck and broke parts and wiring in the process; they ransacked all of the bags and property in the back of Sonny's truck;  and when the court forced defendants to return Sonny's truck to him, the truck was not drivable because defendants had removed the seat, dashboard, and other interior parts of the truck and just thrown them back into the truck;

205.   The same defendants who questioned released Jessica from custody in Stockton showed up at plaintiff Joann Ramirez's house about an hour after Jessica got back to the house from Stockton. Jessica, ARM, and EVM were staying with Joann because they had no other place to go and had no transportation. Jessica was terrified because she thought she was going to be arrested and taken away from her children and family even though she knew she had done nothing wrong.

206.   The defendants asked Joann if Sonny had anything at the house.  When Joann said Sonny did not have anything at the house, the defendants asked her if they could search her house anyway.  Joann asked the defendants if they had a search warrant and they told her they did not have a warrant.  Joann knew Sonny was not capable of doing what he had been accused of doing and told the officers she would consent to a search but that Sonny did not have anything at her house; the defendants elected not to search the house, and instead asked Joann to have Jessica come to the door.

207.   Again, Jessica was very upset because she thought she was going to be arrested and separated from her children and family, but the defendants did not arrest her; they harassed her instead, with threats and intimidation. The defendants ordered Jessica not to leave the residence in case they needed to come back and arrest her or ask her more questions.  Jessica was terrified by the defendants and was afraid if she left the residence she would be arrested.  So Jessica did not leave the residence *at all* for more than 30 days because the defendants ordered her not to leave. And the defendants were not done harassing Jessica.

COMPLAINT AND DEMAND FOR JURY TRIAL

208.  Defendant Crouch was responsible for returning Sonny's truck and property to him, and told Sonny to "send me the bill."

209.  Defendant Crouch, or someone acting on his behalf, notified the victims' family when Sonny would be at the West Sacramento Police Department headquarters to pick up his truck, and the victims' family members were waiting for Sonny when he arrived; Sonny had members of his family with him when he arrived at the West Sacramento Police Department headquarters on Jefferson Drive in West Sacramento.  Some of the victim's family members confronted Sonny and his family, and Sonny feared for his safety and the safety of his family.  The victim's family members were yelling obscenities and Sonny heard one of the males on the telephone talking to someone about coming to the scene to confront Sonny and his family.

210.  The defendants put the plaintiffs and their family members at risk of harm from retaliation by the victim's family.  The victim's family told an employee of the Yolo County District Attorney's Office that the family was going to take the law into their own hands and get Sonny, and the threat was reported to Sonny's public defender so he could alert Sonny to the threat and potential danger. Since the threat was made, the plaintiffs' family has been threatened twice and the plaintiffs now live in constant fear of retaliation that affects their ability to work and play.

211.  The supervisory defendants directed their subordinates in the acts or failures to act that deprived the plaintiffs of their civil rights; the supervisory defendants set in motion a series of acts by subordinates that the supervisory defendants knew, or reasonably should have known would cause subordinates to deprive the plaintiffs of their civil rights; the supervisory defendants knew that subordinates were engaging in unlawful acts and omission that would deprive the plaintiffs of their civil rights, and the supervisory defendants failed to act; or the supervisory defendants conduct was so closely related to the deprivation of the plaintiffs' civil rights as to be the moving force that caused the ultimate deprivation of some or all of the plaintiffs' civil rights.

00010014.docx

212.   The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### (Fourteenth Amendment)

213.   Plaintiffs incorporate the allegations in paragraphs 22 through 212 into this claim for relief.

214.   Plaintiffs bring this claim for relief under 42 U.S.C. § 1983 to redress the deprivation of their rights under the Fourteenth Amendment.  This claim for relief is brought against all of the individual defendants in their individual capacities.

215.  Plaintiff Sonny Martinez was charged with committing crimes in furtherance of the conspiracy to deprive him of his civil rights.

216.  Sonny was charged with committing the crimes on the basis of deliberately fabricated evidence.

217.  Sonny was charged with committing the crimes despite the fact the defendants knew he was innocent, or were deliberately indifferent to his innocence.

218.  The defendants continued to investigate Sonny despite the fact they knew he was innocent, or were deliberately indifferent to his innocence.

219.  The defendants used investigative techniques that were so coercive and abusive that they knew, or were deliberately indifferent, that their techniques would yield false information that would be used to prosecute Sonny.

220.  Defendants mislead the magistrate to obtain the order to seal the probable cause affidavits because they knew Sonny could not make bail or otherwise challenge his incarceration without the information and they wanted Sonny in jail as an investigative tool to expose to informants and make and receive communications

to monitor for anything that might help the revive the stalled investigation into the shooting.

221.   Sonny was wrongfully incarcerated in the Yolo County jail for 53 days, and under threat the charges could be refiled until February 23, 2016, when the Court ordered the defendants to return the property they seized and the defendants finally announced they would not refile the charges against Sonny because they did not have any evidence that he committed the crime.

222.   The defendants knew at the time the criminal charges were filed against Sonny that he was innocent.

223.   The defendants knew at the time the criminal charges were filed against Sonny that he did not call Altamirano and confess to the shooting.

224.   The defendants knew at the time the criminal charges were filed against Sonny that they did not have probable cause to file the charges.

225.   Defendants arrested Sonny for investigation purposes only in the hope that something might turn up to assist them with their stalled investigation into the shooting.

226.   The defendants knew if they gave the sealed documents to Sonny's public defender that Sonny would have the charges dismissed and he would be released from jail before they could expose him to informants in jail and monitor his communications.

227.   The defendants knew Sonny would pose no threat to Altamirano or the Altamirano family when he discovered what Altamirano had done.  And Altamirano has no fear of Sonny hurting him or hurting his family as evidenced by his behavior. Altamirano is easy to fond, follow, photograph, and approach; he regularly goes outside of his unit at the South Harrison Street housing complex to work on cars in his driveway area, which is a dangerous place to work if he is concerned about a drive by shooting or someone walking up and hurting him while he is under a car working and distracted.  Altamirano also drives around Stockton and makes no effort to stay

inconspicuous to protect himself from harm.  Every magistrate considering the warrant applications presented by the defendants would want to have this information when considering the applications.

228.  Sonny had no connection to the victim or her family.

229.  Sonny had no motive to commit the crime.

230.  The defendants had no evidence that Raymond Orosco, Jr. was involved in the shooting of Alize Valadez.

231.  Within minutes after the defendants arrived at the house on Stonewall Court to execute the warrants, they had the following additional information and knew it was true and exculpatory:

231.1.  The call log on Sonny's cell phone did not contain any calls to Altamirano after the shooting, and the other digital evidence on Sonny's cell phone proved that did not call Altamirano and confess to the shooting like Altamirano claimed.

231.2.  Plaintiffs do not own a dark colored passenger car like the one EW1 observed to be involved in the shooting.

231.3.  Sonny's truck did not match the description of the truck described by the so-called anonymous caller;

231.4.  Altamirano claim that the rims on Sonny's truck were chrome with some remnants of the black vinyl paint was not true; the rims on the truck were almost all black;

231.5.  If Sonny's truck were used in the commission of the Alize Valadez shooting, then there would have been gunshot reside deposited throughout the inside of cab when the shots were fired;

231.6.  If Sonny's truck were used in the commission of the Alize Valadez shooting, then there would have been gunshot reside deposited on the truck body near the open window through which the gunman would have had to fire in a drive-by shooting;

231.7.     The gunshot residue would have been present and detectable when Sonny's truck was seized on October 27, 2015;

231.8.     Sonny's truck was dirty and had obviously not been painted, washed, or wiped down on the inside or outside for a very long time before the crime.

232.   Before they booked Sonny into the Yolo County jail in the late afternoon on October 26, 2015, the defendants had the following additional information and knew it was true and exculpatory:

232.1.     After he was handcuffed, Sonny began asking the defendants at the house on Stonewall Court what was going on and who were they looking for, but the defendants told him to be quiet;

232.2.     Two officers wearing khaki pants and light blue, long-sleeved shirts asked Sonny what his name, and when Sonny told them his name, one of the defendants said, "We got him."   Sonny immediately asked the defendants, "You've got who?  I didn't do anything wrong."  One of the defendants then ordered Sonny to stand up and he escorted Sonny to a police vehicle parked next to Sonny's truck.  Sonny asked the defendant again, "what did I do?" The defendant told Sonny to be quiet and they will let him know later;

232.3.     Sonny was able to observe what was going on around the police vehicle and his truck before the same two defendants with the khakis and light blue shirts got into the vehicle and drove away from the scene with Sonny in custody in the back seat.  Sonny asked the defendants where they were going and the defendant sitting in the passenger seat told Sonny they were taking him to West Sacramento. Then he asked Sonny what he [Sonny] could tell him about the 13-year-old girl getting shot in the head with a .357 over the weekend, and Sonny said he could not tell him anything. Sonny told the defendants that Altamirano came over to his house and asked him the same question the day before and Sonny told Rafa he did not know anything about the shooting. There was no television in the house on Stonewall Court while the plaintiffs lived there, and they did not buy papers or listen

00010014.docx

to news on the radio.  Sonny then asked the defendant, "you don't think I did it do you?" And the defendant asked Sonny who he had called.  The defendant told Sonny they had two calls putting you in West Sacramento at the time of the shooting and he [Sonny] was lying.  Sonny kept pleading his innocence and telling the defendants they had the wrong man. Sonny went back and forth with the two defendants all the way from Stockton to the police station in West Sacramento, and Sonny repeatedly told the defendants he was innocent and that they had the wrong person and bad information.

232.4.      Once at the police station, the defendants put Sonny in a room and left him in the room handcuffed to the table for about two hours to punish him for proclaiming his innocence.  When the defendants returned to the room, they again told Sonny that they had information from two people that put you at the crime scene, and Sonny said, "bullshit, I was in Stockton. Plus, I don't go to West Sac for any reason."  The defendants then said, "Come on, two people Sonny," to which Sonny replied that he had not done anything and was a family man living in Stockton."  The defendants left the room and left Sonny handcuffed to the table for another two hours to punish him some more for continuing to proclaim his innocence and telling the defendants they were on the wrong track.  When the defendants re-entered the room, they slammed a folder down on the table in front of Sonny and were obviously angry that Sonny was maintaining his innocence.  The defendants said, "Sonny, you said you were doing nothing bad, that you were clean."  Sonny said that was true, and the defendants lied to Sonny to try to scare him into making a false confession.  They told Sonny the FBI was watching him, and then put a picture down in front of Sonny that looked like a soda can and around cake that were painted green and told Sonny the picture was of bombs Sonny sold to someone.  Sonny knew the defendants were lying and told them if he was selling bombs he would be in federal custody and to go ahead and call the FBI because if they were following him, they could tell the defendants that he did not do the shooting and was in Stockton when the shooting happened. The

COMPLAINT AND DEMAND FOR JURY TRIAL

defendants' demeanors were ones of obvious frustration and anger, and they told Sonny the FBI had just quit watching him because they did not have enough to arrest him.  Sonny replied that selling bombs is enough to arrest him, which made the defendants even angrier. They took the picture of the "bombs" back, turned it over and put it under their folder and moved to the next coercive tactic – more lies.  They took out another photo and put it down on the table in front of Sonny and asked Sonny whose gun was in the picture.  Sonny denied knowing anything about the gun, but it was not the one used in the crime because the officers told Sonny on the drive from Stockton to West Sacramento that the gun used in the crime was a .357 and the gun in the picture looked like a .32 or .38 caliber.  One of the defendants then asked Sonny if his finger prints were going to turn up on the gun, and Sonny said no.  Sonny told the officer to go ahead and finger print him, that his finger prints are not on the gun. When the defendants said they had two witnesses and Sonny said, "bring them." One of the defendants told Sonny that one of the witnesses said they saw a heavy set guy driving a white truck, and Sonny said, "do you know how many heavy set guys there are that drive a white truck?" The defendants then told Sonny he called the other witness and told him what you did, to which Sonny replied you are kidding me, right? Sonny demanded to see his phone so he could shoe the defendants that whoever was giving them that information was lying. One of the defendants then said, we know you take orders from higher and accused Sonny of being a gangster. Sonny denied the charge and protested being arrested on hearsay. Sonny reiterated his request to take a lie detector test.  Sonny also told the defendants he would take any other test they wanted to give him to prove he was innocent.  Sonny then told the defendants he was tired and hungry, and the defendants left.  After about twenty minutes, one of the defendants returned to the room with about 5 peanuts on a napkin and Sonny said that was not enough food, to which the defendant replied, "that's all there is." Defendants left Sonny handcuffed to the table for another 1-2 hours to punish him for maintaining his innocence.  Defendants then returned and told Sonny he was

00010014.docx

going to jail.  Sonny kept telling the defendants he was innocent and did not do it, but his pleas of innocence were disregarded. Sonny asked the defendant who took him to jail how he was going to feel knowing he put an innocent man in jail, and the defendant replied in a smart-alecky way, "I will be here when you get out to apologize." But the defendant was not there to apologize to Sonny when Sonny was released from jail.

233.   Sonny was very cooperative with defendants, and demanded that hey check his cell phone to see that whoever said he called them was lying, and give him a lie detector test, DNA test, gunshot residue test.  Sonny's cooperation and demands are not typical of a guilty person.

234.   The defendants deprived Sonny of his right to due process by having the probable cause affidavits and other warrant documents sealed under false pretenses.

235.   None of the defendants bothered to ask Sonny if he was an active street gang member.

236.   None of the defendants asked Sonny if he was a prison gang member.

237.   None of the defendants asked Sonny if he had any street gang tattoos.

238.   None of the defendants asked Sonny if he had any prison gang tattoos.

239.   Sonny adamantly maintained his innocence to defendant.

240.   Sonny demanded a lie detector test, but the defendants told Sonny they did not have anyone who could administer the test; the defendants could have arranged for Sonny to give a lie detector test, but the defendants were deliberately or recklessly indifferent to the truth and wanted Sonny in jail for investigative reasons.

241.   Sonny demanded that the defendants check his phone to see that he did not call whoever the defendants alleged that he called, but the defendants were deliberately or recklessly indifferent to the truth and wanted Sonny in jail for unlawful reasons.

242.   The defendants took a DNA swab from Sonny's mouth.

243.  Sonny demanded a gunshot residue test, which was taken on October 27, 2105 and was negative for gunshot residue on Sonny and his truck.

244.  Sonny's truck was thoroughly tested for gunshot residue on October 27, 2015 and all of the tests for gunshot residue inside and outside of Sonny's truck were negative for gunshot residue.

245.  Sonny's truck was not used in the crime or the lead detective admitted on video that gunshot residue would have been found in the truck.

246.  The defendants did not read Sonny his rights until they were booking him into the Yolo County jail.

247.  On or before November 3, 2015, the defendants had the following additional information and knew it was true and exculpatory:

247.1.    Sonny's cell phone was in Stockton at the time of the crime;

247.2.    Sonny called his mother from Stockton at 8:25 p.m. on Saturday, October 24, 2015, and talked to his mother for 19 minutes;

247.3.    Sonny's cell phone bill and usage records did not contain any record of any calls to Altamirano after the Alize Valadez shooting;

247.4.    Sonny's cell phone bills and usage records did not contain any record of any calls to Altamirano at any time;

247.5.    Sonny was and is innocent of the charges filed against him.

248.  The individual defendants induced the Yolo County District Attorney's office to prosecute Sonny by their fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith.

249.  Plaintiff Sonny Martinez was arraigned in Yolo County Superior Court on October 29, 2015, but the defendants concealed the exculpatory information they possessed at that time because they wanted Sonny in jail for investigation purposes.

250.  The defendants unreasonably delayed proceeding with the probable cause determination at a preliminary hearing to continue investigating Sonny.

251.  The defendants did not disclose to Sonny or his public defender the ex-parte information they provided to the court before the bail hearing.

252.  Defendants acted with deliberate indifference, or reckless disregard, for plaintiffs' rights and the truth in withholding and concealing evidence that strongly indicated Sonny's innocence of the crimes for which he was charged; and they continued to incarcerate Sonny after it was, or should have been, known that Sonny was entitled to be released.

253.  Sonny was arraigned on October 29, 2015, and was appointed counsel because of his indigence. The defendants concealed the exculpatory evidence they had at that time from the court, from Sonny, and from Sonny's newly appointed public defender, and had they turned that evidence over at that time as required by law Sonny could have proved his innocence immediately and been out of jail and back at home with his family immediately.

254.  As soon as Sonny was put in jail, the defendants began monitoring and recording his phone calls and reading his mail, and continued to monitor and record his phone calls and read his mail until he was released from jail on December 18, 2105.

255.  A preliminary hearing in Sonny's criminal case was scheduled for December 18, 2015, which was the 53rd day after Sonny was first jailed.  The purpose of the preliminary hearing is for the defendants to prove there is probable cause for the charges and enhancements the defendants leveled against Sonny and that the defendants were using to keep Sonny behind bars to aid in their investigation of the Alize Valadez shooting.   And while continuing to concealing the overwhelming exculpatory evidence of Sonny's innocence, the defendants asked for their fourth continuance of the preliminary hearing.

256.  The defendants deprived Sonny of the companionship and society of the other plaintiffs, and the other plaintiffs of the companionship and society of Sonny.

00010014.docx

257.  The defendants intended to harm the plaintiffs, and their misconduct will shock the conscience of the court reviewing the evidence in this case.

258.   The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

### THIRD CLAIM FOR RELIEF

### (Eighth Amendment)

259.  Plaintiffs incorporate the allegations in paragraphs 213 through 258 into this claim for relief.

260.  Plaintiffs bring this claim for relief under 42 U.S.C. § 1983 to redress the deprivation of Sonny's Eighth Amendment rights regarding bail. This claim for relief is brought against all of the individual defendants in their individual capacities.

261.  Plaintiff Sonny Martinez was denied reasonable bail because the defendants intentionally, deliberately, or recklessly mislead the magistrate and court, concealed exculpatory evidence that would have entitled Sonny to be released from jail without bail, charged Sonny with committing crimes without probable cause to deprive Sonny of the ability to make financial bail so they could monitor his communications in jail.

262.  The defendants filed ex-parte affidavits with the court bearing on Sonny's right to bail, but failed to disclose the ex-parte communications to Sonny and his public defender which, of disclosed, would have resulted in a dismissal of the charges.

263.  The defendants wanted Sonny in jail and not out on bail, but knew he was entitled to be released because he was innocent.

COMPLAINT AND DEMAND FOR JURY TRIAL

264.   The defendants deprived Sonny of the companionship and society of the other plaintiffs, and the other plaintiffs of the companionship and society of Sonny.

265.   The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF

### (Malicious Prosecution)

266.   Plaintiffs incorporate the allegations in paragraphs 259 through 265 into this claim for relief.

267.   Plaintiffs bring this claim under 42 U.S.C. § 1983 to redress the deprivation of Sonny's rights under the First, Fourth, Eighth, and Fourteenth Amendments. This claim is against all of the individual defendants in their individual capacities.

268.   The individual defendants were actively instrumental in causing the Yolo County District Attorney to initiate the criminal proceeding against Sonny. They induced the prosecution by their fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith.

269.   The defendants procured the arrest of Sonny and prosecuted Sonny with malice and without probable cause for the purpose of denying Sonny his constitutional rights.

270.   The defendants sought the continuances of the preliminary hearing because they knew they did not have probable cause for their actions and knew they would lose the ability to keep Sonny incarcerated to carry out their plan to see they could learn something to help them solve the Alize Valadez shooting; they also

wanted to avoid having to make a public record of their misconduct if they went forward with the preliminary hearing.

271.   The criminal prosecution was without probable cause and was part of the plan or object of the conspiracy among all of the individual defendants.

272.   Sonny was targeted by the defendants in part because of his prior associations in violation of his rights under the First Amendment.

273.   The defendants induce the criminal prosecution as part of the conspiracy, and induced the criminal prosecution as part of the conspiracy despite knowing Sonny was not guilty of any of the crimes he was charged with committing. And all of the defendants knew that the prosecution could not meet its burden of proof at the preliminary hearing, so caused the preliminary hearing to be postponed for as long as possible in deliberate or reckless disregard of the Plaintiffs' constitutional rights.

274.   The defendants unreasonably delayed proceeding with the probable cause determination at a preliminary hearing, and gave false information to the court and Sonny's public defender to secure a continuance. On information and belief, the gang expert for the People was not in training on the day of the preliminary hearing as the individual defendants led the prosecuting attorney to believe and so advise the judge.

275.   Sonny case was scheduled for trial beginning on December 18, 2015, so the same two West Sacramento defendants paid Jessica a second visit at plaintiff Joann Ramirez's home in Sacramento. Jessica was again afraid they were there to arrest her and she began crying.  She did not feel free to leave to return to the family in the house.  The defendants told her to step outside of the house and told her to step into the garage where nobody could see them talking. They asked Jessica if Sonny shot the girl and if Sonny shot the girl on orders from "upstairs."  Jessica told the defendants Sonny did not shoot the girl and that she and Sonny moved from Stockton to get away from all the gang activity in south Sacramento.  The defendants then told

00010014.docx

Jessica they had a note that Sonny wrote "saying differently." Jessica did not believe the defendants and she told them to show her the note; one of the defendants flashed a piece of paper at Jessica really quickly and she could tell that it was not written by Sonny and told the defendants so. Next, the defendants said they had proof from her Facebook and Instagram account that she went onto the victim's brother's Instagram page and said Sonny is the one who pulled the trigger and shot your sister, which Jessica knew was a lie. She asked to see the note again, but the defendants only flashed a paper at her and said, "see." They would not let her get a good look at the paper or writing on the paper. Jessica knew they were lying and told them so, and told the defendants that they did not have any proof against Sonny because he did not do it (i.e., the crime).  The defendants said they had a lot of evidence against Sonny, and by that point, they were visibly upset and began threatening Jessica; they talked down to Jessica in a demeaning way, and were trying to coerce her into telling them what they wanted to hear. The defendants told Jessica that if they find Sonny guilty they would be back to arrest Jessica for conspiracy; one of the defendants then said if Sonny walks free because there is no evidence that he would come back to the house and apologize to Jessica and the family.  The next day the Yolo County District Attorney sought a continuance of the trial, which was denied, and the court forced the District Attorney's representative to either proceed or dismiss the case for lack of evidence.  The District Attorney was forced to dismiss the case for lack of evidence, thereby admitting they never had probable cause to believe Sonny committed any of the crimes they pile on him to keep him jail.  And neither one of the thugs who threatened Jessica that day came back and apologized to Jessica or Sonny's family.

276.  Two defendants also harassed and threatened to arrest Raymond Orosco, Jr., Sonny's cousin, if he did not give Sonny up.  They played a recording of one of Sonny's telephone calls while he was incarcerated in the Yolo County jail, and claimed Sonny gave him up as a co-conspirator in the crime.  And they called Sonny a "piece

of shit" and told Raymond that he did not want to protect that piece of shit. Ray knew the defendants were lying because he and Sonny are innocent.

277.  The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

### FIFTH CLAIM FOR RELIEF

### (Abuse of Process)

278.  In addition to the allegations in this claim for relief, Plaintiffs incorporate the allegations in paragraphs 266 through 277 into this claim for relief.

279.  Plaintiff Sonny Martinez brings this claim under 42 U.S.C. § 1983 to redress the deprivation of his rights under the Fourth, Eighth, and Fourteenth Amendments by maliciously prosecuting him for crimes the defendants knew he did not commit. This claim is against all of the individual defendants in their individual capacities**.

280.  The defendants intentionally, deliberately, or recklessly abused the affidavit sealing process, continuance process, and other processes in the criminal case against Plaintiff Sonny Martinez to keep him incarcerated as long as possible in the hope that his incarceration would turn up information to aid them in solving the Alize Valadez shooting.

281.  Defendants cased the processes available in the criminal case against Sonny to be used for unlawful reasons that violated Sonny's constitutional rights.

282.  The defendants' unlawful acts and omissions were a substantial factor in causing Sonny harm and depriving Sonny of his constitutional rights.

283.  The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate

00010014.docx

result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

## SIXTH CLAIM FOR RELIEF

### (False Arrest and Imprisonment)

284.  In addition to the allegations in this claim for relief, Plaintiffs incorporate the allegations in paragraphs 278 through 283 into this claim for relief.

285.  The individual defendants were acting in the course and scope of their employment.

286.  The defendants intentionally subjected Sonny, Jessica, ARM, and EVM to false arrest, and confined them and deprived of their freedom to leave for lengthy periods of time without their consent or lawful privilege to do so.

287.  The defendants subjected Sonny to false imprisonment for more than 3 months without his consent or lawful privilege to do so.

288.   Sonny, Jessica, ARM, and EVM were harmed by the tortious conduct of the defendants.

289.  The defendants conduct was a substantial factor in causing the harm sustained by Sonny, Jessica, ARM, and EVM.

290.  The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

## SEVENTH CLAIM FOR RELIEF

### (Unreasonable Search and Seizure)

291.  Plaintiffs incorporate the allegations in paragraphs 284 through 290 into this claim for relief.

COMPLAINT AND DEMAND FOR JURY TRIAL

292.  Plaintiffs bring this claim for relief under Article 1 to, § 13 of the California Constitution to redress the deprivation of their right to be free from unreasonable searches and seizures. This claim for relief is brought against all of the defendants.

293.  The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

**SEVENTH CLAIM FOR RELIEF**

**(Assault)**

294.  In addition to the allegations in this claim for relief, Plaintiffs incorporate the allegations in paragraphs 291 through 293 into this claim for relief.

295.  The defendants intended to cause harmful or offensive contact when they executed the unlawful search and seizure warrants.

296.  The defendants acted in furtherance of the conspiracy.

297.  Each of the individual defendants committed, aided or abated the assault.

298.  Sonny, Jessica, ARM, and EVM reasonably believed they were about to be touched in a harmful or offensive way.

299.  The defendants threatened to touch Sonny, Jessica, ARM, and EVM in a harmful or offensive way.

300.  The defendants had the present ability to carry out their threats.

301.  The defendants touched Jessica in an offensive and sexual way.

302.  It reasonably appeared to Sonny, Jessica, ARM, and EVM that the defendants were going to carry out their threats.

303.  Neither Sonny, Jessica, ARM, nor EVM consented to the defendants' conduct.

304.   Sonny, Jessica, ARM, and EVM were harmed, and deprived of their peace of mind and right to live without fear of personal harm.

305.   The defendants conduct was a substantial factor in causing the harm suffered by Sonny, Jessica, ARM, and EVM.

306.   The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

**EIGHTH CLAIM FOR RELIEF**

**(Battery)**

307.   In addition to the allegations in this claim for relief, Plaintiffs incorporate the allegations in paragraphs 294 through 306 into this claim for relief.

308.   The defendants touched Sonny and Jessica in harmful and offensive ways with the intent to harm or offend them.

309.   The defendants used excessive force against Sonny, Jessica, ARM, and EVM to execute the unlawful warrants.

310.   Neither Sonny nor Jessica consented to the touching.

311.   Sonny and Jessica were harmed, and deprived of their interest in freedom from intentional unlawful, harmful, or offensive contact with their bodies.

312.   Each of the individual defendants committed, aided or abated the battery.

313.   The defendants conduct was a substantial factor in causing the harm suffered by Sonny and Jessica.

314.   The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression,

COMPLAINT AND DEMAND FOR JURY TRIAL

00010014.docx

and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

## NINTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

315. In addition to the allegations in this claim for relief, Plaintiffs incorporate the allegations in paragraphs 307 through 314 into this claim for relief.

316. The defendants conduct was extreme and outrageous, and done in furtherance of the conspiracy.

317. The defendants intended to cause plaintiffs Sonny, Jessica, ARM, and EVM emotional distress, or deliberately or recklessly disregarded the probability that plaintiffs would suffer emotional distress, knowing that plaintiffs were each present when the outrageous conduct occurred.

318. Plaintiffs suffered severe and extreme emotional distress.

319. The defendants conduct was a substantial factor in causing Sonny, Jessica, ARM, and EVM to suffer emotional distress.

320. Each of the individual defendants committed, aided or abated the intentional infliction of emotional distress.

321. The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

## TENTH CLAIM FOR RELIEF

### (Conversion)

322. In addition to the allegations in this claim for relief, Plaintiffs incorporate the allegations in paragraphs 315 through 321 into this claim for relief.

323.  The defendants exercised substantial dominion and control over the plaintiffs' personal property without lawful privilege or consent and in furtherance of the conspiracy.

324.  The defendants failed to account for all of the personal property they seized pursuant to the unlawful search warrants.

325.  The plaintiffs were deprived of the use and enjoyment of their personal property.

326.  The defendants conduct was a substantial factor in causing the harm suffered to the plaintiffs.

327.  The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

## ELEVENTH CLAIM FOR RELIEF

### (Trespass)

328.  In addition to the allegations in this claim for relief, Plaintiffs incorporate the allegations in paragraphs 322 through 327 into this claim for relief.

329.  The defendants entered into the house on Stonewall Court without lawful privilege or consent and in furtherance of the conspiracy.

330.  The defendants interfered with the plaintiffs' quiet use and enjoyment of the house.

331.  The defendants conduct was a substantial factor in causing the harm suffered to the plaintiffs.

332.  The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression,

00010014.docx

1   and fraud and otherwise engaged in misconduct to justify the imposition of punitive

2   damages.

3       WHEREFORE, the plaintiffs pray for judgment as set forth below.

4   **TWELFTH CLAIM FOR RELIEF**

5   **(Cal. Civ. Code 52.1)**

6       333.   In addition to the allegations in this claim for relief, Plaintiffs

7   incorporate the allegations in paragraphs 328 through 332 into this claim for relief.

8       334.   Plaintiffs bring this claim for treble damages against all defendants

9   under The Tom Bane Civil Rights Act, California Civil Code § 52.1.

10       335.   Defendants interfered with plaintiffs' exercise and enjoyment of their

11   rights under the Constitution and laws of the United States and state of California

12   by actual and attempted threats, intimidation, and coercion.

13       336.   The defendants conduct was a substantial factor in causing the harm

14   suffered to the plaintiffs.

15       337.   The plaintiffs suffered compensatory damages and special damages for

16   lost earnings and lost earning capacity and medical care as an actual and proximate

17   result of the defendants' misconduct. The defendants acted with malice, oppression,

18   and fraud and otherwise engaged in misconduct to justify the imposition of punitive

19   damages.

20       WHEREFORE, the plaintiffs pray for judgment as set forth below.

21   **THIRTEENTH CLAIM FOR RELIEF**

22   **(Loss of Consortium)**

23       338.   Plaintiffs incorporate the allegations in paragraphs 333 through 337

24   into this claim for relief.

25       339.   Plaintiffs Sonny Martinez and Jessica Martinez bring this claims

26   against the defendants for loss of consortium.

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

00010014.docx

340.  The defendants conduct caused Sonny and Jessica to lose the conjugal society, comfort, affection, companionship, moral support of the other while Sonny was incarcerated.

341.  The defendants conduct was a substantial factor in causing the harm suffered to the plaintiffs.

342.  The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

### FOURTEENTH CLAIM FOR RELIEF

### (Negligence)

343.  Plaintiffs incorporate the allegations in paragraphs 338 through 342 into this claim for relief.

344.  The defendants were grossly negligent.

345.  The plaintiffs were harmed by the defendants' gross negligence.

346.  The plaintiffs suffered severe and extreme emotional distress.

347.  The defendants' gross negligence was a substantial factor in causing plaintiffs harm.

348.  The plaintiffs suffered compensatory damages and special damages for lost earnings and lost earning capacity and medical care as an actual and proximate result of the defendants' misconduct. The defendants acted with malice, oppression, and fraud and otherwise engaged in misconduct to justify the imposition of punitive damages.

WHEREFORE, the plaintiffs pray for judgment as set forth below.

COMPLAINT AND DEMAND FOR JURY TRIAL

## PRAYER FOR RELIEF

349.   Compensatory damages.

350.   Special damages for the medical expenses to treat plaintiff Joann Ramirez's two heart attacks, and the cost of future medical and related care because of her two heart attacks.

351.   Treble damages.

352.   Punitive damages against each of the individual defendants.

353.   An order to the defendants to account for all of the property they seized, and an order for the defendants to return the plaintiffs property, including all duplicates and copies, in their possession, custody, or control.

354.   Cost of suit, including reasonable attorney fees.

355.   Reasonable attorney fees.

356.   All other relief authorized by law or that the Court deems just.


October 27, 2016
*/s/ Douglas R. Thorn*

_____

Douglas R. Thorn
Attorney for Plaintiffs