1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              EASTERN DISTRICT OF CALIFORNIA

10

11    SONNY MARTINEZ et al.,                    No. 2:16-cv-02566-TLN-EFB

12              Plaintiffs,

13        v.                                     **ORDER GRANTING IN PART
                                                 PLAINTIFFS' MOTION FOR LEAVE TO
14    CITY OF WEST SACRAMENTO et al.,            AMEND AS TO FEDERAL DEFENDANTS**

15              Defendants.

16

17         This matter is before the Court on Plaintiffs Sonny Martinez, Jessica Martinez,

18    individually and as guardian ad litem for minors VJM, GRM, ARM, and EVM, and Joann

19    Ramirez's (collectively, "Plaintiffs") Motion for Leave to File First Amended Complaint.  (ECF

20    No. 64.)  Defendants Dan T. Zwicky and the United States of America (collectively, the "Federal

21    Defendants") filed an opposition.  (ECF No. 66.)  For the reasons set forth below, the Court

22    GRANTS in part and DENIES in part Plaintiffs' motion as to the Federal Defendants, (ECF No.

23    64).

24    ///

25    ///

26    ///

27    ///

28    ///

                                               1

# I.    PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on October 27, 2016 against the City of Stockton and its Police Department, an individual named Dan T. Zwicky, the City of West Sacramento and various of its employees, and an individual named Rafael Altamirano. (ECF No. 1.) The Complaint alleges deprivations of Plaintiffs' constitutional rights as guaranteed by the First, Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution. (ECF No. 1.) The Complaint also makes out numerous supplemental claims for relief under the California Constitution, the state's common law of tort, and its statutory law. (ECF No. 1.)

On February 13, 2017, the United States notified the Court of its substitution in place of Zwicky for purposes of all state law tort claims alleged against him, pursuant to provisions of the Federal Tort Claims Act codified at 28 U.S.C. § 2679. (ECF No. 37.) This substitution rested on the certification by the Chief of the Civil Division of the U.S. Attorney's Office for the Eastern District of California that "defendant Dan T. Zwicky is an employee of the United States and was acting in the scope of such employment at the time of the events alleged in the Complaint, and so, by operation of law, is entitled to the official immunity of the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 for all tort claims." (ECF No. 37 at 3.) Specifically, the U.S. Attorney's Office certified Zwicky as a federal employee because during the events in the Complaint, he was assigned as a Task Force Officer on the Federal Bureau of Investigation's ("FBI") Safe Streets Task Force. (ECF No. 44-1 at 1–2.)

Following its limited substitution as a defendant, the United States moved to dismiss all state law tort claims originally alleged against Zwicky on grounds that the Court lacks subject matter jurisdiction to hear those claims as alleged against the United States. (ECF No. 44.) Specifically, the United States argued that it has waived sovereign immunity for tort claims only to the extent that an administrative claim is first submitted to the appropriate federal agency as required by 28 U.S.C. §§ 2401(b) and 2675(a), which did not occur here. (ECF No. 44-1 at 2–3.) As evidence that no such administrative claim was filed, the United States submitted a declaration from Deborah Crum—the Unit Chief of Discovery Processing Unit I in the FBI's Office of General Counsel—stating that no administrative claims exist in the FBI's Central Records System

for Plaintiffs Sonny Martinez or Jessica Martinez. (ECF No. 44-2 at 1–2.)

Plaintiffs filed an opposition to the United States' motion to dismiss in which they conceded that their failure to comply with administrative claim adjudication procedures would be fatal to their "claims covered by the Westfall Act" if the Court were to rule that the United States was properly substituted as the defendant for those claims. (ECF No. 54 at 3.) For that reason, Plaintiffs used their opposition to "challenge the Attorney General's course and scope certification of Defendant Zwicky under the Westfall Act." (ECF No. 54 at 1.) To vindicate this challenge, Plaintiffs requested "limited discovery and an evidentiary hearing if necessary to resolve the factual dispute" about whether Zwicky was properly certified as acting within the course of his federal employment during the events giving rise to this litigation. (ECF No. 54 at 2.) Plaintiffs also set forth ten additional factual allegations in their opposition papers, allegations they argue would—if proven—invalidate the United States' certification that Zwicky was acting as a federal employee during the events giving rise to the complaint. (ECF No. 54 at 2–3.)

The United States filed a reply in support of its motion to dismiss, contending that (i) Plaintiffs failed to allege facts sufficient to overcome the presumption of propriety that the Court must afford the U.S. Attorney's Office's certification of Zwicky as a federal employee, and (ii) even if Plaintiffs had alleged sufficient facts to meet their initial evidentiary burden challenging this certification, the challenge would still fail because the evidence demonstrates that Zwicky was at all relevant times acting within the scope of his federal employment. (ECF No. 62.) As evidentiary support for this second argument, the United States attached a declaration from Zwicky which stated that he has been a sworn federal officer on the FBI's Stockton Violent Gang Safe Streets Task Force since 2014. (ECF No. 62-1.) The United States also attached a declaration from a Supervisory Special Agent in the FBI's Stockton Resident Agency which stated that Zwicky's task force investigated drug trafficking, gangs, and violent crime in the Stockton area. (ECF No. 62-2.)

Separately, Zwicky filed his own motion to dismiss the remaining constitutional tort claims alleged against him in the Complaint. (ECF No. 43.) Specifically, Zwicky argued that the Complaint's allegations failed to state a claim that he, through his own individual actions and not

merely as a member of a group, committed any acts that rise to the level of a constitutional violation. (ECF No. 43-1 at 1.) Zwicky also argued that he is entitled to qualified immunity for the actions he allegedly committed because he did not "personally engage[] in any actions that violated the Constitution." (ECF No. 43-1 at 3.) Plaintiffs filed an opposition to Zwicky's motion. (ECF No. 53.)

The separate motions to dismiss filed by the United States, (ECF No. 44), and by Zwicky, (ECF No. 43), remain pending before the Court, as does Plaintiffs' request for an evidentiary hearing to challenge the United States' course-and-scope certification pursuant to the Westfall Act, (ECF No. 54). Plaintiffs now request leave to amend their complaint under Federal Rule of Civil Procedure ("Rule") 15(a)(2). (ECF No. 64.) The Federal Defendants filed a joint opposition. (ECF No. 66.) The Federal Defendants' opposition argued that the Court should deny Plaintiffs' request for leave to amend because Plaintiffs unduly delayed amending their pleadings, the amended allegations are so implausible as to be made in bad faith, and the proposed amendment would prejudice the Federal Defendants. (ECF No. 66 at 1–5.) The Federal Defendants' opposition also argued that allowing amendment would be futile as to the state law tort claims originally alleged against Zwicky, because any such amendments would not change the fact that the Court lacks subject matter jurisdiction over those claims as brought against the United States. (ECF No. 66 at 5.) As to the non-state-law claims that remain against Zwicky, the Federal Defendants argued that leave to amend those claims should be denied because they are implausible and fail to allege Zwicky's personal involvement in the constitutional violations alleged. (ECF No. 66 at 5–6.)

## II. STATE TORT CLAIMS ALLEGED AGAINST ZWICKY IN ORIGINAL COMPLAINT

### A. Factual Allegations

Plaintiffs' Complaint alleges that, as relevant here, the following summary of events occurred giving rise to the state law tort claims alleged against Zwicky.

In the evening of October 24, 2015, a thirteen-year-old resident of West Sacramento named Alize Valadez was shot while she sat inside her grandmother's house in West Sacramento. (ECF No. 1 ¶ 72.) Over at least the next two days, local and regional news media outlets

broadcast details of Ms. Valadez's shooting. (ECF No. 1 ¶¶ 110, 119.) During this same period, Defendant Rafael Altamirano, who was a convicted felon acting as a paid informant, (ECF No. 1 ¶¶ 18, 32–39), and who interacted with known gangs, (ECF No. 1 ¶¶ 48, 51), unsuccessfully attempted numerous times to contact Plaintiff Sonny Martinez via cellular phone, (ECF No. 1 ¶¶ 95, 111). Zwicky, who according to the Complaint was an employee of the City of Stockton's Police Department, (ECF No. 1 ¶ 16), on October 26 spoke both with Altamirano and with one or more of the Defendants who were employed by the City of West Sacramento, (ECF No. 1 ¶¶ 120–21). Altamirano claimed to Zwicky that Martinez had confessed to shooting Ms. Valadez. (ECF No. 1 ¶ 139.13.) On October 26, Altamirano drove to Martinez's residence and asked if Martinez had heard about the shooting of Ms. Valadez, which Martinez denied. (ECF No. 1 ¶ 124.) Later that same day, Altamirano made three additional and unsuccessful attempts to contact Martinez via cellular phone "at the request of one or more defendants." (ECF No. 1 ¶¶ 126–28.)

When West Sacramento law enforcement agents investigating Ms. Valadez's shooting applied for and obtained search warrants targeted at Martinez, they falsely stated in their probable cause affidavits that Martinez had called Altamirano to confess to shooting Ms. Valadez and that this shooting was gang-related. (ECF No. 1 ¶¶ 133–38.18, 140.1–41.14.) Once these invalid warrants were in hand, unspecified "defendants" then took numerous steps to deprive Plaintiffs of their First, Fourth, Eighth, and Fourteenth Amendment rights by arresting Sonny Martinez and searching and seizing his and his family's property without probable cause, (ECF No. 1 ¶¶ 144–57), using unreasonable force when they executed search warrants at his residence, (ECF No. 1 ¶¶ 158–204), harassing Jessica Martinez once the warrants were executed, (ECF No. 1 ¶¶ 205–07), prosecuting Sonny Martinez on the basis of fabricated evidence, (ECF No. 1 ¶¶ 213–31.8, 266–73), mistreating him while he was being interrogated and refusing to accept exculpatory evidence from his cellular phone records, (ECF No. 1 ¶¶ 232–47.5), withholding exculpatory information from Sonny Martinez's defense team and recording his communications while he was in custody, (ECF No. 1 ¶¶ 248–55), concealing exculpatory evidence from the state court hearing the ensuing criminal case against him, (ECF No. 1 ¶¶ 259–65), initiating a criminal

prosecution against Sonny Martinez without probable cause and delaying a probable cause determination in his criminal case while they harassed his family members for evidence, (ECF No. 1 ¶¶ 267–77), and abusing established criminal adjudicatory processes in order to keep him in custody for as long as possible, (ECF No. 1 ¶¶ 278–83).

These and other actions undertaken by again unspecified "defendants" amounted to commission of the following torts: false arrest and false imprisonment, (ECF No. 1 ¶¶ 284–90), assault, (ECF No. 1 ¶¶ 294–306), battery, (ECF No. 1 ¶¶ 307–14), intentional infliction of emotional distress, (ECF No. 1 ¶¶ 315–21), conversion, (ECF No. 1 ¶¶ 322–27), trespass, (ECF No. 1 ¶¶ 328–32), causing loss of consortium, (ECF No. 1 ¶¶ 338–42), and general negligence, (ECF No. 1 ¶¶ 343–48). Plaintiffs also allege that these actions violated their rights protected by article I, section 13 of the California Constitution, (ECF No. 1 ¶¶ 291–93), and by section 52.1 of California's Civil Code, (ECF No. 1 ¶¶ 333–37).

     *i.*     *Additional Factual Allegations Specifically Relating to Scope of Zwicky's Employment*

In support of their argument that they are entitled to limited discovery and an evidentiary hearing regarding whether Zwicky was acting outside the course and scope of any federal employment during the events giving rise to this litigation, Plaintiffs make ten distinct factual allegations. (ECF No. 54.)

Those allegations are, in summary, as follows: (i) the website for the FBI task force to which Zwicky was assigned states that the task force's purpose is to pursue violent gangs; (ii) the FBI was not authorized to investigate Ms. Valadez's shooting; (iii) Ms. Valadez's shooting took place in West Sacramento, not in Stockton where Zwicky's task force is located; (iv) Martinez was prosecuted for the shooting of Ms. Valadez in state court; (v) no evidence exists that Ms. Valadez's shooting was related to gang activity; (vi) Zwicky told prosecutors that his employer was the Stockton Police Department and not any federal agency; (vii) Zwicky told prosecutors that Altamirano was an informant for the Stockton Police Department; (viii) Zwicky himself said that he was not investigating Ms. Valadez's shooting; (ix) Altamirano is not an informant for the FBI; and (x) Altamirano was paid—presumably for the information he provided relating to Ms.

1    Valadez's shooting—by the Stockton Police Department and not by the FBI or the United States.

2    (ECF No. 54 at 2–3.)

3            B.      Standard of Law

4            Plaintiffs' state law tort claims against Zwicky implicate the Federal Tort Claims Act and

5    an amendment to that statute known as the Westfall Act, which together govern immunity from

6    state law tort claims enjoyed by the United States and its employees.

7                    i.      Federal Tort Claims Act

8            "Absent a waiver of sovereign immunity, courts have no subject matter jurisdiction over

9    cases against the government." *Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1117 (9th Cir. 2003)

10   (citing *United States v. Mitchell*, 463 U.S. 206, 212 (1983)). "The [Federal Tort Claims] Act

11   gives federal district courts exclusive jurisdiction over claims against the United States for 'injury

12   or loss of property, or personal injury or death caused by the negligent or wrongful act or

13   omission' of federal employees acting within the scope of their employment." *Levin v. United*

14   *States*, 568 U.S. 503, 506 (2013) (quoting 28 U.S.C. § 1346(b)(1)). However, the Act "requires,

15   as a prerequisite for federal court jurisdiction, that a claimant first provide written notification of

16   the incident giving rise to the injury, accompanied by a claim for money damages to the federal

17   agency responsible for the injury." *Munns v. Kerry*, 782 F.3d 402, 413 (9th Cir. 2015) (citing 28

18   U.S.C. § 2675(a); 28 C.F.R. § 14.2(b); *Johnson v. United States*, 704 F.2d 1431, 1442 (9th Cir.

19   1983)). Where plaintiffs fail to allege or provide evidence that they have exhausted their

20   administrative remedies under the Act, "they cannot rely on that statute's waiver of sovereign

21   immunity for jurisdiction." *Id.*

22          The remedy available to claimants under the Federal Tort Claims Act "is exclusive of any

23   other civil action or proceeding for money damages by reason of the same subject matter against

24   the employee whose act or omission gave rise to the claim or against the estate of such

25   employee." 28 U.S.C. § 2679(b)(1). The only two exceptions to this exclusivity provision are for

26   claims "brought for a violation of the Constitution of the United States" or for claims "brought for

27   a violation of a statute of the United States under which such action against an individual is

28   otherwise authorized." *Id.* § 2679(b)(2).

                                                    7

*ii.* *Westfall Act*

The Supreme Court in *Osborn v. Haley* explained the Westfall Act's substitution procedure as follows:

> The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties. When a federal employee is sued for wrongful or negligent conduct, the Act empowers the Attorney General to certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." Upon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee.

549 U.S. 225, 229–30 (2007) (citations omitted); *see also Rodriguez v. Swartz*, 899 F.3d 719, 740 (9th Cir. 2018) ("Under the Westfall Act, if a federal agent commits a tort while acting within the scope of his or her employment, then any resulting civil suit must be brought against the United States under the FTCA. If the agent is sued individually, the United States is substituted as the defendant." (footnote omitted) (citing 28 U.S.C. § 2679)), *petition for cert. filed*, 2018 WL 4348517 (U.S. Sept. 7, 2018) (No. 15-16410). The U.S. Attorney's Office for the district where a civil tort action is brought "is authorized to make the statutory certification that the Federal employee was acting within the scope of his office or employment with the Federal Government at the time of the incident out of which the suit arose." 28 C.F.R. § 15.4.

"The Attorney General's decision regarding scope of employment certification [under the Westfall Act] is conclusive unless challenged. Accordingly, the party seeking review bears the burden of presenting evidence and disproving the Attorney General's decision to grant or deny scope of employment certification by a preponderance of the evidence." *Saleh v. Bush*, 848 F.3d 880, 889 (9th Cir. 2017) (alteration in original) (quoting *Green v. Hall*, 8 F.3d 695, 698 (9th Cir. 1993)). The party challenging certification under the Westfall Act bears a heavy burden, for "where the United States has assumed the benefits and burdens of defending its employee, [courts] will not disturb that decision unless presented with substantial evidence requiring [them] to do so." *Clamor v. United States*, 240 F.3d 1215, 1219 (9th Cir. 2001). To meet this heavy burden, the party challenging the Attorney General's course-and-scope certification must "allege sufficient facts that, taken as true, would establish that the defendant's actions exceeded the scope

of his employment." *Saleh*, 848 F.3d at 889 (quoting *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009)). When determining whether sufficient facts have been alleged to take a federal employee's conduct outside the scope of that federal actor's employment, courts apply the principles of *respondeat superior* of the state in which the allegedly tortious conduct occurred. *Id.* The Court is the proper trier of fact regarding scope of employment questions, *id.* at 892 n.11, and may rule based solely on the written record where all allegations against certification—taken as true—still fail to establish by a preponderance of the evidence that the federal employee acted outside the scope of employment, *id.* at 892.

### iii.      Vicarious Liability in California

In California, an employee is within the scope of employment "when in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158, 1163 (9th Cir. 2005) (quoting *Farmers Ins. Grp. v. Cty. of Santa Clara*, 906 P.2d 440, 448 (Cal. 1995)). Stated another way, when considering scope of employment questions "the inquiry should be whether the risk was one that may fairly be regarded as typical of or broadly incidental to the enterprise undertaken by the employer." *Id.* (quoting *Farmers Ins. Grp.*, 906 P.2d at 448).

As this authority makes clear, California's test for vicarious liability is interpreted broadly in favor of finding an employee's actions to be within the scope of employment. *Id.* California courts have applied this principle particularly expansively in cases involving law enforcement officers who are accused of "misuse of official authority." *Mary M. v. City of L.A.*, 814 P.2d 1341, 1352 (Cal. 1991). The rationale for this liberal application of *respondeat superior* in the law enforcement context is that "[i]n view of the considerable power and authority that police officers possess, it is neither startling nor unexpected that on occasion an officer will misuse that authority" because "the risk of . . . tortious conduct is broadly incidental to the enterprise of law enforcement." *Id.* at 1350.

A law enforcement officer's actions are therefore within the course and scope of employment under California law where the conduct in question occurs while the peace officer is

on duty as a peace officer, occurs while the peace officer is exercising his authority as a peace officer, and results from the use of his authority as a peace officer. Judicial Council of Cal. Civ. Jury Instrs. No. 3721 (2019). Hence, courts have held that law enforcement officers may be acting within the course and scope of their employment under California law when they misuse their official authority as officers to sexually assault detainees. *Mary M.*, 814 P.2d at 1352; *Doe v. City of San Diego*, 35 F. Supp. 3d 1195, 1208–09 (S.D. Cal. 2014). Just as instructively, courts have found law enforcement officers to be acting outside the course and scope of their employment in cases where the officers' alleged misconduct did not flow from a misuse of their official authority. *See, e.g.*, *Hoblitzell v. City of Ione*, 2 Cal. Rptr. 3d 8 (Ct. App. 2003) (non-uniformed officer not in course of employment when he visited a work site outside of his jurisdiction in an unmarked vehicle, falsely identified himself as a building inspector, and harassed a contractor at the contractor's work site at the behest of an acquaintance); *Henriksen v. City of Rialto*, 25 Cal. Rptr. 2d 308, 312–13 (Ct. App. 1993) (off-duty officer not in course of employment when he accidentally shot a colleague because "the incident did not occur during working hours, was not accomplished by use of [the officer's] authority as a police officer, [and] did not occur in the course of acts that [the officer] was carrying out under his employer's instructions or on his employer's behalf").

*iv.    Summary*

As the above authority makes clear, where tort plaintiffs sue a federal employee without first complying with the Federal Tort Claims Act's claim presentation requirements, the fate of the tort claims is yoked to the validity of the Attorney General's scope-of-employment certification. If the Attorney General's certification is upheld under the law of vicarious liability in the state where the allegedly tortious conduct occurred, *Saleh*, 848 F.3d at 889, then the United States is thereby substituted as the defendant for those tort claims, *Osborn*, 549 U.S. at 229–30.

Once the United States is the defendant, the Federal Tort Claims Act gives the district court subject matter jurisdiction over the tort claims only if the plaintiffs allege or provide evidence that they exhausted administrative remedies by submitting a written claim for tort damages to the appropriate federal agency. *Munns*, 782 F.3d at 413. If the district court sees no

such allegation or evidence, it lacks subject matter jurisdiction over the tort causes of action and must dismiss them on that basis. *See id.* ("The plaintiffs have not alleged or provided evidence that they have exhausted their administrative remedies under the FTCA, so they cannot rely on that statute's waiver of sovereign immunity for jurisdiction.").

## C. Analysis

### i. *Westfall Act Certification*

As mandated by *Saleh*, 848 F.3d at 889, the Court views as initially conclusive the certification by the U.S. Attorney's Office that Zwicky was "an employee of the United States and was acting in the scope of such employment at the time of the events alleged in the Complaint," (ECF No. 37 at 3). Because Plaintiffs challenge this certification, it is their burden to show by a preponderance of the evidence that Zwicky was not, in fact, acting within the scope of his employment as a federally deputized Task Force Officer at the time of the events alleged in the Complaint. *Saleh*, 848 F.3d at 889. This requires Plaintiffs to show that the actions attributed to Zwicky were not, under California law, "typical of or broadly incidental to the enterprise" of law enforcement in the context of a federally deputized task force. *Nationwide Mut. Ins. Co.*, 408 F.3d at 1163 (quoting *Farmers Ins. Grp.*, 906 P.2d at 448). As explained below, Plaintiffs have not done so.

The activities allegedly engaged in by Zwicky in the Complaint are foreseeable actions taken by a federally deputized law enforcement officer responding to information from a known informant relevant to a crime in a neighboring jurisdiction. *See Mary M.*, 814 P.2d at 1352 (noting the broad applicability of *respondeat superior* principles when law enforcement officers are accused of "misuse of official authority"). It is entirely foreseeable that Zwicky, in his capacity as a deputized officer for a federal anti-gang task force, would speak with a gang-involved individual like Altamirano and convey to the proper local law enforcement authority whatever information was given him by that informant. (ECF No. 1 ¶¶ 30, 48, 51, 120–21, 139.13.) Communicating intelligence and coordinating efforts across agencies is, in many respects, the very essence of law enforcement work in our multi-jurisdictional system. Indeed, to find Zwicky's alleged conduct in the Complaint to be outside the scope of his federal employment

11

would require the strained reasoning that it was not "typical of or broadly incidental to the enterprise" of federal law enforcement for Zwicky to relay to the West Sacramento Police Department whatever information he learned from Altamirano during their conversation the day following the shooting of Ms. Valadez. *Nationwide Mut. Ins. Co.*, 408 F.3d at 1163 (quoting *Farmers Ins. Grp.*, 906 P.2d at 448); (ECF No. 1 ¶¶ 120–21, 139.13).

And while it is not permissible for a federally deputized law enforcement officer like Zwicky to knowingly contribute false information to probable cause affidavits, the question of whether this alleged conduct was proper is not the inquiry currently before the Court. (*See* ECF No. 1 ¶¶ 133–38.18.) The inquiry currently before the Court is whether it is reasonably foreseeable that Zwicky would conspire with local law enforcement colleagues to include in probable cause affidavits questionable information learned from a gang-involved informant in the midst of a tense and highly publicized investigation into the shooting of an innocent girl. *See Saleh*, 848 F.3d at 889; (ECF No. 1 ¶¶ 133–138.18, 139.13). The Court finds that such alleged conduct by Zwicky is, in fact, foreseeable under California's broad application of *respondeat superior* principles. *See Mary M.*, 814 P.2d at 1350 ("The precise circumstances of the [officer's allegedly tortious conduct] need not be anticipated, so long as the risk is one that is reasonably foreseeable."). First, the Complaint contains no allegations that Zwicky's conduct occurred while he was off duty, during a time when he was not exercising his authority as a federal law enforcement officer, or in contravention of the FBI's instructions. *See* Judicial Council of Cal. Civ. Jury Instrs. No. 3721 (2019); *Henriksen*, 25 Cal. Rptr. 2d at 312–13. Second, nowhere do Plaintiffs allege facts suggesting that Zwicky's conduct was motivated by personal animus he or someone close to him may have harbored toward Martinez or anyone else. *See Hoblitzell*, 2 Cal. Rptr. 3d at 10 (concluding that actions of public employees that occur "outside of their official duties, and for personal reasons" are not within the scope of employment). Hence, even though it may arguably be shown to have been wrongful, "[i]n view of the considerable power and authority that police officers possess, it is neither startling nor unexpected that on occasion an officer will misuse" their authority as Zwicky allegedly did, by conspiring to generate and utilize false information to further a criminal investigation. *Mary M.*, 814 P.2d at 1350; (ECF No. 1 ¶¶

133–138.18, 139.13).

The allegations in Plaintiffs' request for an evidentiary hearing on the United States' Westfall Act certification fail to overcome the presumption of validity that the Court must afford that certification. *Saleh*, 848 F.3d at 889. The thrust of these allegations is that Zwicky was outside the scope of his FBI employment when he acted as alleged in the Complaint because the FBI had nothing to do with the investigation into the shooting of Ms. Valadez, there was no evidence the shooting was gang-related, the shooting took place outside of the jurisdiction of Zwicky's agency, and Zwicky represented at the time that he was working for the Stockton Police Department and not the FBI. (ECF No. 54 at 2–3.) Even accepting these supplemental allegations as true, they fail to show that it was outside his federal employment on an FBI task force for Zwicky to communicate with Altamirano about an unsolved violent crime involving at least one firearm, particularly where Plaintiffs' own allegations state that Altamirano was a police informant who owed money to the Sureño gang and was involved in drug- and firearm-related activity, (ECF No. 1 ¶¶ 18, 32–51); *see also West v. City of Mesa*, 708 F. App'x 288, 290 (9th Cir. 2017) (applying Arizona law to uphold Westfall Act certification relating to City of Mesa employee who "was assigned to the FBI's Joint Terrorism Task Force"). It is foreseeable— arguably, it is advisable—that a federal law enforcement officer tasked with conducting "proactive, coordinated investigations" into "racketeering, drug conspiracy, and firearms violations" in the Stockton area as Zwicky was, (ECF No. 54 at 2), would maintain contact with, interact with, and work with an informant like Altamirano who owed a debt to a violent gang in the Stockton area, (ECF No. 1 ¶ 48), possessed firearms, (ECF No. 1 ¶ 41), and "could be frequently observed sitting in his car in the parking lot of the housing complex where he lives smoking methamphetamine," (ECF No. 1 ¶ 47). Given that Altamirano was closely linked to precisely the kind of criminality in Stockton that Zwicky was employed by the FBI to combat, (ECF No. 54 at 2), it was "broadly incidental to the enterprise" of his federal employment for Zwicky to speak with Altamirano and communicate what Altamirano told him regarding a violent act perpetrated in a neighboring jurisdiction, *Nationwide Mut. Ins. Co.*, 408 F.3d at 1163 (quoting *Farmers Ins. Grp.*, 906 P.2d at 448); (ECF No. 1 ¶¶ 120–21, 139.13). This is particularly true

given that the person implicated in that violent act by Altamirano—Sonny Martinez—lived in Stockton during the time encompassed by the Complaint, (ECF No. 1 ¶¶ 24, 55), and had family members who associated with known felons convicted of drug and violent crimes, (ECF No. 1 ¶¶ 26, 32–40).

Given these factual allegations and given his responsibilities as a federal task force officer assigned to "proactive, coordinated investigations," into drug and firearms crimes, Zwicky arguably would have failed in his federal task force duties had he *not* participated in an investigation that was based largely on evidence from Altamirano claiming that Martinez perpetrated a violent shooting in a neighboring city. (ECF No. 54 at 2.) Accordingly, pursuant to 28 U.S.C. § 2679(d)(1), the United States is substituted as the defendant in this litigation for the following causes of action originally alleged against Defendant Zwicky:

1. Sixth Claim for Relief (False Arrest and Imprisonment);

2. Seventh Claims for Relief (Assault and for violation of article I, section 13 of the California Constitution);[1]

3. Eighth Claim for Relief (Battery);

4. Ninth Claim for Relief (Intentional Infliction of Emotional Distress);

5. Tenth Claim for Relief (Conversion);

6. Eleventh Claim for Relief (Trespass);

7. Twelfth Claim for Relief (Tom Bane Civil Rights Act, section 52.1 of the California Civil Code);[2]

---

[1]     Plaintiffs' original Complaint contains two claims titled "Seventh Claim for Relief," one of which is a claim of common law assault, (ECF No. 1 ¶¶ 294–306), and the other of which is a claim brought for violating Plaintiffs' right to be free from unreasonable searches and seizures pursuant to article I, section 13 of the California Constitution, (ECF No. 1 ¶¶ 291–93). Both constitute claims subject to the Federal Tort Claims Act because assault is a common law tort in California and claims brought to vindicate rights protected by California's constitution are covered by the Federal Tort Claims Act. *See Papa v. United States*, 281 F.3d 1004, 1010 n.20 (9th Cir. 2002) (construing claim brought for interference with plaintiffs' rights under the California constitution as an "FTCA claim[]").

[2]     The parties dispute whether the Federal Tort Claims Act applies to Plaintiffs' claim brought pursuant to the Tom Bane Civil Rights Act, which is codified as section 52.1 of California's Civil Code. (ECF No. 54 at 3–4; ECF No. 55 at 2 (arguing that claim brought under the Bane Act is not a common law claim subject to the Westfall Act); ECF No. 62 at 8 (arguing that a Bane Act claim against a federal employee fails as a matter of law).) In the Ninth Circuit, Bane Act claims fall within the purview of the Federal Tort Claims Act. *Lu v. Powell*, 621 F.3d 944, 949–50 (9th Cir. 2010) (construing Bane Act claim of interference with right to asylum as a "viable tort" claim under Federal Tort Claims Act).

8.     Thirteenth Claim for Relief (Loss of Consortium); and

9.     Fourteenth Claim for Relief (Negligence).

### ii.     *Plaintiffs' Request for Evidentiary Hearing*

Given the broad interpretation of vicarious liability under California law as analyzed above, Plaintiffs have not alleged facts showing it is more likely than not that Zwicky was acting outside the scope of his employment as a federal task force officer at the time of the events in the Complaint. *See Saleh*, 848 F.3d at 889; *Nationwide Mut. Ins. Co.*, 408 F.3d at 1163. Accordingly, there is no need for an evidentiary hearing on this issue because Plaintiffs' factual allegations regarding Zwicky's scope of employment, even if proven, would be insufficient to overcome the presumption afforded the certification by the U.S. Attorney's Office that Zwicky was acting as a federal officer during the events giving rise to the Complaint. *See Saleh*, 848 F.3d at 892 ("But because the allegations in the operative complaint, taken as true, do not establish that Defendants acted outside the scope of their employment, an evidentiary hearing would be a futile exercise.").

Plaintiffs' request for an evidentiary hearing regarding the validity of the certification that Defendant Zwicky was acting within the course and scope of his federal employment during the time encompassed by the complaint, (ECF No. 54), is therefore DENIED.

### iii.     *Disposition of State Tort Claims Pursuant to Federal Tort Claims Act*

Plaintiffs admit they do not allege they have satisfied the administrative exhaustion requirements of the Federal Tort Claims Act. (ECF No. 54 at 3 ("Assuming, arguendo, the Court upholds the certification, Plaintiffs concede the Court is without jurisdiction to hear claims covered by the Westfall Act.").) Because those administrative requirements are a prerequisite to the Court exercising subject matter jurisdiction over tort claims brought against the United States, s*ee Munns*, 782 F.3d at 413, the United States' Motion to Dismiss, (ECF No. 44), is GRANTED as to the state tort causes of action for which the United States is now the defendant.

### III.     STATE TORT CAUSES OF ACTION ALLEGED AGAINST ZWICKY IN PROPOSED FIRST AMENDED COMPLAINT

Plaintiffs moved for leave to amend the Complaint and attached a proposed First

Amended Complaint ("FAC"). (ECF No. 64.) The proposed FAC continues to name Zwicky as a defendant against Plaintiffs' state law tort claims, presumably because when the FAC was filed the Court had not yet ruled on Plaintiffs' objections to the United States' substitution as the defendant for purpose of those claims. (ECF No. 64 ¶ 19.) The United States, now validly substituted as the defendant against the state tort claims originally alleged against Zwicky, opposed Plaintiffs' request for leave to amend their state tort claims on grounds that any amendment would be futile because "[t]he United States has been substituted as defendant in place of TFO Zwicky 'for all tort causes of action,'" and so "the Court lacks jurisdiction over any such claims against the United States." (ECF No. 66 at 5.)

A.    Factual Allegations

Plaintiffs' proposed First Amended Complaint would allege that, as relevant here, the following summary of events occurred giving rise to the claims against Zwicky.

Zwicky was a Stockton police officer who used Altamirano as an informant, (ECF No. 64 ¶ 54), and who participated in the investigation of the tragic shooting of Ms. Valadez, (ECF No. 64 ¶ 19). Following local news broadcasts regarding the shooting of Ms. Valadez in West Sacramento on October 24, 2015, Altamirano on October 26 contacted Zwicky to offer information regarding the shooting. (ECF No. 64 ¶ 102.) Zwicky knew that Altamirano was desperate for money and for leniency in his separately pending criminal actions relating to his involvement with the Sureño gang, (ECF No. 64 ¶¶ 38–39, 53, 103), and also knew that Altamirano was an unreliable informant who had provided inaccurate information to Zwicky in the past. (ECF No. 64 ¶¶ 103–07.) The two met at the Stockton Police Department on October 26, at which point Altamirano told Zwicky that Martinez had called Altamirano and confessed to shooting Ms. Valadez, and that Martinez drove a 2006 white Chevrolet Silverado with black stripes on the bottom. (ECF No. 64 ¶ 108.)

Zwicky proceeded to contact a member of the West Sacramento Police Department to relay the information he had learned from Altamirano. (ECF No. 64 ¶¶ 116–17.) The West Sacramento Police Department officer who spoke with Zwicky told Zwicky that the shooting of Ms. Valadez may have been a gang-related retaliation against Ms. Valadez's father. (ECF No. 64

¶ 118.)  At the West Sacramento Police Department's request, Zwicky began to drive Altamirano to West Sacramento to talk to the officers investigating the shooting of Ms. Valadez, during which trip Zwicky instructed Altamirano to contact Martinez via text message.  (ECF No. 64 ¶¶ 119–20.)  When Altamirano's attempt to contact Martinez went unacknowledged, Zwicky and Altamirano instead drove to Martinez's residence so that Altamirano could—unsuccessfully, it turned out—attempt to record Martinez admitting to the shooting.  (ECF No. 64 ¶¶ 120–24.)  Zwicky and Altamirano then completed their drive to West Sacramento, during which they discussed the shooting.  (ECF No. 64 ¶ 154.)  Meanwhile, still on October 26, West Sacramento police officers received information from an eyewitness to Ms. Valadez's shooting that identified the shooter's vehicle as being substantially different from the vehicle Martinez typically drove.  (ECF No. 64 ¶¶ 125–53.)

When Zwicky and Altamirano arrived at the West Sacramento Police Department headquarters on October 26, they and a host of West Sacramento Police Department officers met while Altamirano's cellular phone underwent a Cellibrite analysis.  (ECF No. 64 ¶¶ 155–57.)  This analysis revealed that Martinez did not contact Altamirano by phone following Ms. Valadez's shooting, meaning he could not have admitted to the shooting as Altamirano claimed.  (ECF No. 64 ¶ 158.)  Following this initial meeting, Zwicky and the West Sacramento Police Department officers held a second meeting at which they agreed to disregard the truth, as revealed by the Cellibrite analysis, that Martinez never contacted Altamirano to confess to shooting Ms. Valadez.  (ECF No. 64 ¶ 162.)  At this second meeting, Zwicky and the West Sacramento Police Department officers decided to use Altamirano's false account of Martinez's confession to obtain warrants and withhold exculpatory material from Martinez, steps that they hoped would lead to actual evidence that furthered their investigation.  (ECF No. 64 ¶¶ 163–66.)  Accordingly, at Zwicky's direction, Altamirano then made numerous attempts to contact Martinez via phone and text message, none of which were successful.  (ECF No. 64 ¶¶ 159–61.)  Zwicky and the West Sacramento Police Department Officers then recorded a statement from Altamirano, a statement which differed from the account of Martinez's fabricated confession that Altamirano had initially provided only to Zwicky.  (ECF No. 64 ¶ 168.)

Based in part on the information obtained from Altamirano through Zwicky and on information obtained from Zwicky directly, West Sacramento Police Department officers submitted false probable cause affidavits in applications for warrants to search Martinez's residence, vehicle, and other property for evidence related to the shooting of Ms. Valadez. (ECF No. 64 ¶¶ 176–200.) They also installed a tracking device on Plaintiffs' vehicle without a valid warrant authorizing them to do so, (ECF No. 64 ¶¶ 172–74), and falsified reports to cover up this illegal action, (ECF No. 64 ¶ 175). Zwicky and other law enforcement agents from Stockton and West Sacramento then served and executed the improperly obtained warrants, using unconstitutionally excessive force and means. (ECF No. 64 ¶¶ 201–10.) On the basis of invalid warrants, members of the alleged conspiracy—though not Zwicky personally—confined Plaintiffs to their home (and, in Sonny Martinez's case, to law enforcement custody) while they searched and seized Plaintiffs' property. (ECF No. 64 ¶¶ 211–42.)

Once Martinez was arrested as a suspect in the shooting of Ms. Valadez, the conspirators interrogated him without reading him his *Miranda* rights and without receiving permission to so interrogate him from Martinez himself or from his attorney. (ECF No. 64 ¶¶ 254–59.) They also repeatedly misled various judicial officers to ensure that Martinez was denied his constitutional right to bail despite the lack of actual evidence tying him to the shooting of Ms. Valadez; Zwicky specifically agreed to falsify evidence and perjure himself by testifying at a probable cause hearing that Altamirano—on whose word the entire case against Martinez at this point rested—was a reliable informant. (ECF No. 64 ¶¶ 260–64, 271–300.) Zwicky further joined with his law enforcement cohorts—which by this point included individuals from the Yolo County District Attorney's Office—to ensure that Martinez was charged in the shooting of Ms. Valadez and that the preliminary hearing in this criminal case was delayed, all while Zwicky and his fellow conspirators knew Martinez was not the shooter. (ECF No. 64 ¶¶ 301–06.)

Plaintiffs claim that based on his alleged conduct as outlined in summary above, Zwicky violated their right under California's Constitution to be free from unreasonable searches and seizures, (ECF No. 64 ¶¶ 314–15), and that he committed the following California torts: false imprisonment (Tenth Claim for Relief), assault (Eleventh Claim for Relief), battery (Twelfth

18

Claim for Relief), intentional infliction of emotional distress (Thirteenth Claim for Relief), conversion (Fourteenth Claim for Relief), and trespass (Fifteenth Claim for Relief). (ECF No. 64 ¶¶ 316–53.) Plaintiffs' Sixteenth Claim for Relief is that Zwicky is liable to them on the basis of section 52.1 of California's Civil Code. (ECF No. 64 ¶¶ 354–55.) Plaintiffs' Seventeenth Claim for Relief is that Zwicky is liable in tort under a traditional common law negligence theory. (ECF No. 64 ¶¶ 356–60.) Plaintiffs' Eighteenth Claim for Relief is that Zwicky is liable in tort for the loss of consortium between Sonny Martinez and his wife Jessica Martinez. (ECF No. 64 ¶¶ 361–63.)

### B.    Standard of Law

Granting or denying leave to amend a complaint rests in the sound discretion of the trial court. *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996) (citing *Rhoden v. United States*, 55 F.3d 428, 432 (9th Cir. 1995)). Under the Federal Rules of Civil Procedure, "a party may amend its pleading only with the opposing party's written consent or the court's leave," and the "court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

"Courts may decline to grant leave to amend only if there is strong evidence of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc.'" *Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (alteration in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam) (citing *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997)).

Nonetheless, "futility of amendment alone can justify the denial of a motion" for leave to amend. *Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009) (citing *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004)). A proposed amendment is futile where "the amended complaint would also be subject to dismissal." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (citing *Saul v. United States*, 928 F.2d 829, 843 (9th

Cir. 1991)).  Leave to amend may also be denied on the grounds of futility where "the pleading could not possibly be cured by the allegation of other facts."  *Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).  When weighing the factors that govern whether to grant leave to amend, the Court must draw "all inferences in favor of granting the motion."  *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999) (citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)); *see also Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) (stating that granting leave to amend represents a policy that "is to be applied with extreme liberality").

C.     Analysis

For the reasons set forth below, the Court finds that the FAC's state law claims as alleged against Zwicky would be subject to dismissal on the same grounds upon which the state law claims in the original Complaint were dismissed.

*i.     Westfall Act Certification*

Even assuming the facts alleged against Zwicky in the FAC are true, they fail to establish by a preponderance of the evidence that Zwicky was acting outside the course and scope of his federal employment during the time encompassed by the FAC.  *See Saleh*, 848 F.3d at 889.  As explained previously, California's liberal approach in assigning vicarious liability to employers means that Plaintiffs must carry a heavy burden to prove that Zwicky was acting outside the course and scope of his employment as a federal task force officer during the events set forth in the FAC.  *See Nationwide Mut. Ins. Co.*, 408 F.3d at 1163 (noting the broad interpretation of *respondeat superior* law in California that favors finding an employee's actions to be within the course and scope of employment); *Mary M.*, 814 P.2d at 1350 (explaining that this principle is particularly salient in the context of accusations of police misconduct).

Nothing that Plaintiffs newly allege in the FAC is sufficient to meet this threshold because all of Zwicky's alleged actions constitute foreseeable conduct by a federally deputized law enforcement officer tasked with combating violent and gang-related crime.  *See Mary M.*, 814 P.2d at 1350 ("The precise circumstances of the [officer's allegedly tortious conduct] need not be anticipated, so long as the risk is one that is reasonably foreseeable.").  It is foreseeable that

Zwicky, as a federal law enforcement officer, would speak with a known local informant such as Altamirano to learn information regarding a violent crime perpetrated by a Stockton resident in a neighboring jurisdiction, in this case the shooting of Ms. Valadez in West Sacramento. (ECF No. 64 ¶¶ 102–07.) This is particularly true given that Zwicky knew of Altamirano's involvement with violent gangs in the Stockton area, (ECF No. 64 ¶¶ 38, 53, 103), because Plaintiffs' own allegations state that the task force to which Zwicky was assigned was charged with investigating violent gangs, (ECF No. 54 at 2). It is also foreseeable that Zwicky would convey whatever information was given him by Altamirano to the proper local law enforcement authority, in this case the West Sacramento Police Department. (ECF No. 64 ¶¶ 116–17.) And when Zwicky learned from his West Sacramento colleagues that they suspected Ms. Valadez's shooting may have been gang-related, (ECF No. 64 ¶ 118), it was foreseeable that Zwicky would remain involved in the investigation given his task force's focus on combating gang violence, (ECF No. 54 at 2). Accordingly, that Zwicky coordinated with West Sacramento police officers and with Altamirano to try to generate further evidence against Martinez is eminently foreseeable, (ECF No. 64 ¶¶ 119–24, 154–57, 159–61, 168), because Martinez was a Stockton resident implicated in a potentially gang-related shooting that occurred in a different municipality, (ECF No. 64 ¶¶ 58, 68), and pursuing violent gangs is what Zwicky was federally deputized to do, (ECF No. 54 at 2).

Furthermore, as explained above in the Court's analysis pertaining to the original Complaint, the subsequent misconduct that Zwicky is accused of engaging in is composed of foreseeable acts of an employee under California's expansive application of vicarious liability to the law enforcement context. *See Mary M.*, 814 P.2d at 1350 (noting that it is "neither startling nor unexpected that on occasion an officer will misuse" his authority and that such misuse of authority is within the course and scope of law enforcement employment). It is not ethical or permissible for Zwicky to conspire with his West Sacramento counterparts to falsify evidence underlying a warrant application, (*see* ECF No. 64 ¶¶ 162, 176, 186–89), but such conduct would not be outside the course of Zwicky's federal employment unless Plaintiffs pointed to facts that he did so, for instance, unconnected to the authority he had as a law enforcement officer or for his own personal gain, *see Hoblitzell*, 2 Cal. Rptr. 3d at 15; *Henriksen*, 25 Cal. Rptr. 2d at 312–13.

But there are no allegations in the FAC or in Plaintiffs' challenge to the U.S. Attorney's course-and-scope certification suggesting as much. (ECF Nos. 54, 64.)

Indeed, lying in a probable cause affidavit is a reasonably foreseeable misuse of federal law enforcement authority because attesting to probable cause is part and parcel of the daily activity of law enforcement aimed at "sustained, proactive, coordinated investigations to obtain prosecutions" for "violations such as racketeering, drug conspiracy, and firearms violations." (ECF No. 54 at 2.) The same is true of the allegations that Zwicky contributed to the excessively forceful manner by which the search warrants targeted at Martinez were executed, (ECF No. 64 ¶¶ 201–49), that Zwicky agreed to perjure himself at Martinez's probable cause hearing, (ECF No. 64 ¶ 299), and that Zwicky played a part in abusing the prosecutorial process to ensure that Martinez was detained, (ECF No. 64 ¶¶ 301–07). Federally deputized law enforcement officers regularly execute warrants, testify in court, and work directly with prosecutors, particularly where, as Plaintiffs' own allegations demonstrate in this case, those officers are tasked with "obtain[ing] prosecutions." (ECF No. 54 at 2.) That Zwicky allegedly engaged in all these activities relating to Martinez without legal justification is still foreseeable because doing so is "broadly incidental to the enterprise of law enforcement" even if it is unjustified. *Mary M.*, 814 P.2d at 1350.

Accordingly, Plaintiffs have not alleged facts sufficient to rebut the certification by the U.S. Attorney's Office that Zwicky was "acting in the scope of [federal] employment at the time of the events alleged in the Complaint." (ECF No. 37 at 3.)

　　　　　*ii.*　　*Disposition of State Tort Claims Pursuant to Federal Tort Claims Act*

Because Zwicky's actions as alleged in the FAC are insufficient to rebut the certification that he was acting in the course and scope of his federal employment during the time encompassed by that pleading, the state law tort claims alleged against him must be brought against the United States. *Osborn*, 549 U.S. at 229–30. The FAC contains no allegations that Plaintiffs have satisfied the administrative exhaustion requirements of the Federal Tort Claims Act, which they must do to maintain suit against the United States. Furthermore, Plaintiffs prior to filing the FAC, admitted they have not done so. (ECF No. 54 at 3 ("Assuming, arguendo, the

Court upholds the certification, Plaintiffs concede the Court is without jurisdiction to hear claims covered by the Westfall Act.").) Those administrative requirements are a prerequisite to the Court exercising subject matter jurisdiction over tort claims brought against the United States, meaning that the proposed amendment to those claims as embodied in the FAC would be futile because "the amended complaint would also be subject to dismissal." *Steckman*, 143 F.3d at 1298; *see also Munns*, 782 F.3d at 413 ("The plaintiffs have not alleged or provided evidence that they have exhausted their administrative remedies under the FTCA, so they cannot rely on that statute's waiver of sovereign immunity for jurisdiction."). Accordingly, the Court DENIES Plaintiffs' request for leave to amend their Ninth through Eighteenth Claims for Relief in the manner alleged against Zwicky in the FAC, (ECF No. 64).

Notwithstanding the above, the Court is not convinced that "the pleading could not possibly be cured by the allegation of other facts." *Watison*, 668 F.3d at 1117. While unlikely given the broad application of the law of *respondeat superior* in California, it is nonetheless possible that Plaintiffs could allege further facts that would overcome the United States' Westfall Act certification by demonstrating that Zwicky was acting outside the scope of his federal employment during the time encompassed by this case's pleadings. *Id.* Furthermore, Plaintiffs could allege further facts demonstrating their compliance with the Federal Tort Claims Act's administrative exhaustion requirements. *See* 28 U.S.C. §§ 2401(b), 2679(d)(5). Accordingly, the Court's denial of leave to amend the state tort claims alleged against the United States is without prejudice to Plaintiffs bringing a subsequent motion for leave to amend the state tort claims originally alleged against Zwicky.

### IV.   CONSTITUTIONAL CAUSES OF ACTION ALLEGED AGAINST ZWICKY

The Court having disposed of the state causes of action originally alleged against Zwicky, the only claims remaining against him that Plaintiffs seek leave to amend are those alleging that Zwicky violated Plaintiffs' rights as protected by the Constitution of the United States. (ECF No. 64 ¶¶ 170–309.)

#### A.   Undue Delay

Zwicky argues that Plaintiffs should not be allowed to amend the Complaint because they

unduly delayed doing so.  (ECF No. 66 at 2–3.)  Specifically, Zwicky points out that more than a year elapsed between the filing of the Complaint and the filing of the FAC, a time period which Plaintiffs have not justified and which "stands in stark contrast to their previous litigation positions."  (ECF No. 66 at 2–3.)

In evaluating undue delay, the Court inquires "whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) (quoting *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1388 (9th Cir. 1990)).  "Undue delay by itself, however, is insufficient to justify denying a motion to amend."  *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999).  As explained below, for Plaintiffs' First, Fourth, Fifth, Sixth, and Seventh Claims for Relief, Zwicky has not identified "strong evidence" of bad faith, prejudice, or futility that would justify denying Plaintiffs leave to file their FAC.  *Sonoma Cty. Ass'n of Retired Emps.*, 708 F.3d at 1117.  Accordingly, there is no need for the Court to analyze whether Plaintiffs unduly delayed moving to amend these constitutional causes of action against Zwicky because even if they had, this alone would be insufficient to justify denying Plaintiffs leave to amend their complaint. *Bowles*, 198 F.3d at 758.

With respect to Plaintiffs' Second and Third Claims for Relief for which the Court does find that granting leave to amend would be futile, the only indication relating to whether Plaintiffs knew or should have known facts that could have been pled in the original Complaint is Plaintiffs' representation that they "continued their informal investigation of the events and occurrences around the arrest and malicious prosecution of Mr. Marteinz [sic] and discovered additional information to further their case."  (ECF No. 64-1 at 2; *see also id.* at 3 (stating that Plaintiffs moved to amend "once they had sufficient evidence to proceed with the amendments" embodied in the FAC).)  While this assertion is certainly generic and leaves the Court little upon which to base a ruling, the Court is nonetheless not persuaded to discredit Plaintiffs' representation.  First, it is not unreasonable to continue investigating facts after filing a complaint. *See Eminence Capital*, 316 F.3d at 1053 (holding that repeated efforts to meet heightened pleading standard not bad faith where plaintiffs proffered that "additional evidence was

forthcoming which would enable them to add necessary details to their complaint"). This is particularly true in a factually intensive case such as this that involves numerous individuals, conspiracy allegations, and related criminal proceedings. (*See, e.g.*, ECF No. 1 ¶¶ 9–21, 141.5–41.9.)

Second, the Court is bound at this stage of the litigation to draw "all inferences in favor of granting the motion," and accordingly infers that Plaintiffs acquired the additional facts alleged in the FAC through good-faith investigation. *Griggs*, 170 F.3d at 880. Third, it is Defendants' burden at this stage of the litigation to defeat the "*presumption* under Rule 15(a) in favor of granting leave to amend" by making "a strong showing" of undue delay, which they have yet to do. *Eminence Capital*, 316 F.3d at 1052. To the extent Defendants believe they are unfairly hamstrung in their ability to meet this burden due to Plaintiffs' counsel's refusal to provide details of the additional factual investigations that gave rise to the FAC, (ECF No. 66 at 4 n.1), denying Plaintiffs leave to amend their Complaint is not the appropriate recourse, *see United States v. Sequel Contractors, Inc.*, 402 F. Supp. 2d 1142, 1154 (C.D. Cal. 2005) (rejecting motion to strike that was predicated on claimed violations of Rule 11(b)).

Accordingly, for those causes of action for which the Court finds that Zwicky has sufficiently demonstrated that it would be futile to allow Plaintiffs to amend their claims via the FAC, the Court finds that Plaintiffs did not unduly delay amending their pleading.

### B. Bad Faith

Zwicky argues that Plaintiffs' amended allegations are made in bad faith because they are so implausible that they must be the product of a violation of Rule 11(b). (ECF No. 66 at 3–4.) The Court considered and rejected this argument when it was incorporated by reference into the opposition to Plaintiffs' motion to amend that was filed by Defendants City of West Sacramento, West Sacramento Police Department, Jason M. Winger, David M. Stallions, Michael Duggins, Kenneth E. Fellows, Carl J. Crouch, Eric M. Palmer, Matthew S. Luiz, Louis Cameron, City of Stockton, and Stockton Police Department (collectively, the "Non-Federal Defendants") in this action. (ECF No. 65 at 4.) For the same reasons set forth in the Court's order relating to the Non-Federal Defendants' arguments against leave to amend, the Court views the bad faith factor

1    as weighing in favor of granting leave to amend as to Zwicky.  (*See* ECF No. 69.)

2               C.      Prejudice

3        Zwicky argues that he will be prejudiced by any additional litigation delay that would

4    occur if leave to amend is granted, a delay which he estimates at between six and twelve months.

5    (ECF No. 66 at 4–5.)  The Court considered and rejected this argument when it was incorporated

6    by reference into the opposition to Plaintiffs' motion to amend that was filed by the Non-Federal

7    Defendants in this action.  (ECF No. 65 at 4.)  For the same reasons set forth in the Court's order

8    relating to the Non-Federal Defendants' arguments against leave to amend, the Court views the

9    prejudice factor as weighing in favor of granting leave to amend as to Zwicky.  (*See* ECF No. 69.)

10               D.      Futility

11        Citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), Zwicky argues that leave to amend

12    should be denied as futile because (i) the conspiracy he is alleged to have engaged in is

13    implausible, and (ii) Plaintiffs fail to allege actions taken individually by Zwicky that violated

14    their constitutional rights.  (ECF No. 66 at 5–6.)

15        Leave to amend may be denied on grounds of futility where the amended complaint would

16    immediately be subject to dismissal, which means that the "proper test to be applied when

17    determining the legal sufficiency of a proposed amendment is identical to the one used when

18    considering the sufficiency of a pleading challenged under Rule 12(b)(6)."  *Nordyke v. King*, 644

19    F.3d 776, 788 n.12 (9th Cir. 2011) (quoting *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th

20    Cir. 1988)), *rev'd on other grounds on reh'g en banc*, 681 F.3d 1041 (9th Cir. 2012).  "The

21    defendant therefore must present adequate argument and authority in support thereof to enable the

22    court to make an informed decision as to futility."  *Johnson v. Serenity Transp., Inc.*, No. 15-CV-

23    02004-JSC, 2015 WL 4913266, at *3 (N.D. Cal. Aug. 17, 2015).

24                 *i.*      *Plausibility Analysis*

25        Zwicky argues that leave to amend should be denied because the FAC's conspiracy

26    allegations are implausible.  (ECF No. 66 at 5–6.)  The Court considered and rejected this

27    argument when it was incorporated by reference into the opposition to Plaintiffs' motion to

28    amend that was filed by the Non-Federal Defendants in this action.  (ECF No. 65 at 4.)  For the

same reasons set forth in the Court's order relating to the Non-Federal Defendants' plausibility arguments against leave to amend, the Court views this factor as weighing in favor of granting leave to amend as to Zwicky. (*See* ECF No. 69.)

### ii. Bivens Analysis

Zwicky argues that, to the extent he was acting under color of federal and not state law at the time of the events alleged in the FAC, the provisions of 42 U.S.C. § 1983 do not reach his conduct. (ECF No. 66 at 6); *see also Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997) (holding that "by its very terms, § 1983 precludes liability in federal government actors"). At the same time, Zwicky does not contest that claims brought against him under 42 U.S.C. § 1983 may be considered as claims brought to vindicate constitutional rights under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). (ECF No. 66 at 6 ("Even if construed as claims under *Bivens* . . . .").) The Court has discretion to construe Plaintiffs' non-state-tort claims against Zwicky as if they had originally been pled as *Bivens* claims. *See Van Strum v. Lawn*, 940 F.2d 406, 409 (9th Cir. 1991) ("Actions under § 1983 and those under *Bivens* are identical save for the replacement of a state actor under § 1983 by a federal actor under *Bivens*."); *Haddock v. Bd. of Dental Exam'rs of Cal.*, 777 F.2d 462, 464 (9th Cir. 1985) ("[A] complaint should not be dismissed if it states a claim under any legal theory, even if the plaintiff erroneously relies on a different legal theory."). The Court will exercise its discretion to do so for the purpose of considering Plaintiffs' request for leave to amend.[3] *See Geiger v. Benov*, No. 1:11-CV-01857 LJO SMS, 2011 WL 5884273, at *1 (E.D. Cal. Nov. 23, 2011) (construing claim brought against federal employee under 42 U.S.C. § 1983 as having been brought as a *Bivens* claim); *Martinez v. United States*, 812 F. Supp. 2d 1052, 1058–59 (C.D. Cal. 2010) (same).

As Zwicky points out, "a plaintiff c[an] not hold an officer liable because of his

---

[3] The Court notes that "the [Supreme] Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity" and that this policy "is in accord with the Court's observation that it has 'consistently refused to extend *Bivens* to any new context or new category of defendants.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (quoting *Iqbal*, 556 U.S. at 675; *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). Because the parties have not briefed the question of whether Plaintiffs' causes of action are cognizable as *Bivens* claims, the Court assumes without deciding for the subsequent discussion that *Bivens* claims are cognizable against Zwicky for the conduct in which he is alleged to have engaged in the FAC.

membership in a group without a showing of individual participation in the unlawful conduct." *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002) (citing *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996)).  In *Jones*, the Ninth Circuit ruled that a section 1983 plaintiff's proposed jury instruction was properly rejected because it would have impermissibly allowed the jury to find law enforcement officers liable for searching a residence by virtue of their "simply being present or being a member of a team" that conducted the search.  *Id.* at 937.  However, the Ninth Circuit's decision in *Jones* does not hold that all allegations of group misconduct are necessarily insufficient to make out a claim for *Bivens*-based relief.  *See id.* at 935 ("*Chuman* does not appear to bar any use of a group liability [theory], but does seem to require the plaintiff to first establish the 'integral participation' of the officers in the alleged constitutional violation.").  Only an allegation of group-based liability "in and of itself without individual participation in the unlawful conduct" fails.  *Chuman*, 76 F.3d at 294.

Accordingly, district courts construing the group liability doctrine of *Jones* and *Chuman* have upheld section 1983 claims against groups of defendants where the pleadings also include factual allegations sufficient to establish that individual defendants were integral participants in the unlawful conduct.  In *Macias v. Filippini*, No. 1:17-CV-1251 AWI EPG, 2018 WL 2264243, at *10 (E.D. Cal. May 17, 2018), a parent indefinitely banned from entering her child's school campus stated a claim against a school resource officer where the officer "was present during the September 2015 meeting [at which the indefinite ban was imposed], reaffirmed [the school principal's] authority to institute an indefinite ban, and threatened arrest if [the plaintiff] 'ever' returned to campus."  In *Ruiz v. Flores*, No. 1:14-CV-00179 AWI, 2015 WL 966148, at *7 (E.D. Cal. Mar. 4, 2015), seven members of a law enforcement task force that conducted an allegedly unlawful search of a home outside the presence of the plaintiff homeowner were made to answer claims against them even though the plaintiff could not identify which individual officers participated in the search, because the court "f[ound] it plausible that the seven defendants, who are alleged to be members of the seven-officer taskforce that Plaintiff alleges to have searched Plaintiff's home, were actively involved in that search."  And in *Johnson v. Shasta Cty.*, 83 F. Supp. 3d 918, 923–24, 927 (E.D. Cal. 2015), plaintiffs who were handcuffed and held at gunpoint

during a twelve-officer law enforcement raid of their home stated a claim against the raid's participants despite the fact that many of the factual allegations generally accused "defendants" of various unlawful acts during the raid.

Finally, to establish a cause of action for a conspiracy to violate civil rights, "a plaintiff must show: '(1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement.'" *Pelenty v. City of Seal Beach*, 588 F. App'x 623, 624 n.2 (9th Cir. 2014) (quoting *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991)); *see also West v. City of Mesa*, 128 F. Supp. 3d 1233, 1240 (D. Ariz. 2015) ("Individuals acting under color of federal law may be held liable under § 1983 only if 'they conspired or acted jointly with state actors to deprive the plaintiffs of their constitutional rights.'" (quoting *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 783 (9th Cir. 2001))), *aff'd*, 708 F. App'x 288 (9th Cir. 2017). Accordingly, where a complaint alleges a civil rights conspiracy as the FAC does here, a defendant's direct participation in allegedly unlawful conduct is not necessarily required so long as the facts "demonstrate[e] the[ conspirators'] causal connections to the violation." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc). This is because "the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired. Conspiracy in § 1983 actions is usually alleged by plaintiffs to . . . aid in proving claims against otherwise tenuously connected parties in a complex case." *Id.* (citations omitted).

a.     First Claim for Relief (Fourth Amendment)

Plaintiffs' Fourth Amendment claim against Zwicky alleges, *inter alia*, that he engaged in a conspiracy that utilized judicial deception to manufacture probable cause to search and arrest Plaintiffs where none actually existed. (ECF No. 64 ¶¶ 155–69, 186–88.) Zwicky asserts that the FAC fails to set forth facts sufficiently alleging Zwicky's personal involvement in the conspiracy to mislead judicial officers. (ECF No. 66 at 6.)

"[G]overnment investigators may be liable for violating the Fourth Amendment when they submit false and material information in a warrant affidavit." *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002). Under this authority, "a § 1983 plaintiff must show that the

investigator 'made deliberately false statements or recklessly disregarded the truth in the affidavit' and that the falsifications were 'material' to the finding of probable cause." *Id.* (quoting *Hervey v. Estes*, 65 F.3d 784, 790 (9th Cir. 1995)). "Conspiracy to violate a citizen's rights under the Fourth Amendment by lying to the magistrate is evidently as much a violation of an established constitutional right as the perjury itself." *Baldwin v. Placer Cty.*, 418 F.3d 966, 971 (9th Cir. 2005).

The FAC contains numerous specific factual allegations of Zwicky's "individual participation in the unlawful conduct" of judicial deception to obtain search warrants. *Jones*, 297 F.3d at 935. Specifically, Plaintiffs allege that Zwicky attempted to use his known informant, Altamirano, to generate evidence inculpating Martinez in the shooting of Ms. Valadez. (ECF No. 64 ¶¶ 159–61.) When this attempt failed, Zwicky and his law enforcement colleagues hatched a conspiracy to disregard the lack of evidence tying Martinez to the shooting and to arrest and prosecute him anyway. (ECF No. 64 ¶¶ 162–69.) This conspiracy began at a specific meeting at the West Sacramento Police Department that Zwicky attended, a meeting which occurred on a particular date and at a particular time. (ECF No. 64 ¶¶ 155, 162.) To achieve the conspiracy's goals, Zwicky told West Sacramento Police Department officers to include misleading information in warrant applications targeted at Martinez. (ECF No. 64 ¶¶ 186–88.) This information was included in the probable cause affidavits, submitted by other officers, in support of the search warrants that other members of the conspiracy obtained from a magistrate, and which led to the searches and seizures of Plaintiffs themselves and of their property. (ECF No. 64 ¶¶ 186–210.)

Just because Zwicky is not alleged to have personally performed every single act which resulted in a false probable cause affidavit being submitted to a magistrate does not mean that the First Amended Complaint contains impermissible "group allegations or boilerplate conspiracy claims." (ECF No. 66 at 6.) Group allegations are permissible so long as "individual participation in the unlawful conduct" is also alleged, as it clearly has been for Plaintiffs' Fourth Amendment claim against Zwicky. *Jones*, 297 F.3d at 935; *see also Macias*, 2018 WL 2264243, at *10. Furthermore, that Zwicky himself did not sign the probable cause affidavit that

incorporated his alleged falsehoods does not doom Plaintiffs' Fourth Amendment claim against him because he played a central role in the alleged conspiracy that culminated in this judicial deception, (ECF No. 64 ¶¶ 162–69, 188–89), and "[c]onspiracy to violate a citizen's rights under the Fourth Amendment by lying to the magistrate is evidently as much a violation of an established constitutional right as the perjury itself," *Baldwin*, 418 F.3d at 971; *see also Harris v. Roderick*, 126 F.3d 1189, 1196 (9th Cir. 1997) (holding that complaint met pleading standard to state *Bivens* cause of action for conspiracy to violate Fourth Amendment rights where it alleged specific meeting at which defendants conspired to concoct a false story related to an officer-involved shooting and then repeated that story during subsequent investigations and judicial proceedings).  The specific factual allegations against Zwicky personally in the FAC make this quite unlike a case alleging group action "in and of itself without individual participation in the unlawful conduct." *Chuman*, 76 F.3d at 294.

Accordingly, permitting the FAC's Fourth Amendment claim to be filed would not be futile solely on the ground that this claim contains impermissibly generalized allegations against Zwicky.[4]  The Court GRANTS Plaintiffs' request for leave to amend their Fourth Amendment claim via the allegations in the FAC, (ECF No. 64).

b.      Second Claim for Relief (First Amendment)

Plaintiffs' First Amendment claim against Zwicky alleges that the "Investigation Team members [including Zwicky] targeted Sonny [Martinez] based on his familial association with Ray and the associations they perceived Sonny to have that are protected under the First Amendment."  (ECF No. 64 ¶ 251.)  Plaintiffs' claim in this regard appears to be that Zwicky and his alleged conspirators intentionally violated Martinez's "right to familial association" protected by the First Amendment, *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001), specifically his right to associate with his cousin Raymond "Ray" Orosco, with whom Plaintiffs lived for a short

---

[4]      The Court expresses no opinion regarding whether other potential deficiencies in Plaintiffs' constitutional claims against Zwicky would subject those claims to dismissal on grounds separate from those asserted in his opposition to Plaintiffs' motion for leave to amend—namely, that Plaintiffs' constitutional claims against Zwicky are futile because they constitute impermissible group allegations.  (ECF No. 66 at 6.)  *See also Johnson*, 2015 WL 4913266, at *3 (noting that while a futility argument entails the same inquiry as a motion to dismiss under Rule 12(b)(6), a defendant arguing futility "must present adequate argument and authority in support [of the traditional Rule 12(b)(6) analysis] to enable the court to make an informed decision as to futility").

time during late October 2015, (ECF No. 64 ¶¶ 58–62).  Zwicky asserts that the FAC fails to set forth facts alleging Zwicky's personal involvement in the deprivation of Plaintiffs' First Amendment familial association rights.  (ECF No. 66 at 6.)

In the Ninth Circuit, a plaintiff may maintain a cause of action for violation of the right to familial association protected by the First Amendment because "the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'"  *Lee*, 250 F.3d at 685 (quoting *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987)).  This First Amendment right to familial association can extend to "cohabitation with relatives."  *Mann v. City of Sacramento*, No. 17-17048, 2018 WL 4268534, at *2 (9th Cir. Sept. 7, 2018) (quoting *Rotary Club*, 481 U.S. at 545–46).  However, there does not appear to be clear Ninth Circuit authority succinctly articulating the elements of such a familial association claim.  *See Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 973 (E.D. Cal. 2017); *Schwartz v. Lassen Cty. ex rel. Lassen Cty. Jail*, No. 2:10-CV-03048-MCE, 2013 WL 5375588, at *10 (E.D. Cal. Sept. 24, 2013) ("[T]he Court is aware of no Ninth Circuit case setting out specifically the conduct or elements that constitute violation of familial association under the First Amendment.").

Despite this paucity of authority, the Ninth Circuit in *Lee*, 250 F.3d at 686, held that a cognizable First Amendment familial association claim at least requires allegations that "defendants' actions . . . constituted an 'unwarranted interference' with" the right to familial association protected by the First Amendment.  *See also Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) ("[W]e have held that claims under both the First and Fourteenth Amendment for unwarranted interference with the right to familial association could survive a motion to dismiss.").  The unwarranted interference in *Lee* occurred where law enforcement officers told a mother searching for her arrested son that they had no record of his location, when the officers knew or should have known that he had been extradited to a different state.  *Lee*, 250 F.3d at 685–86.  "'Unwarranted interference' includes governmental actions that are vexatious and

unnecessary, harassing, unfounded or unreasonable, and arbitrary, discriminatory, or demonstrably irrelevant." *Reyes v. Cty. of San Joaquin*, No. CIVS040428FCDPANPS, 2005 WL 2105030, at *3 (E.D. Cal. Aug. 31, 2005) (citations omitted), *report and recommendation adopted*, No. CIV.S-040428FCDPANPS, 2005 WL 2372703 (E.D. Cal. Sept. 27, 2005). And, consistent with the requirement that constitutional violations allege "individual participation in the unlawful conduct," *Jones*, 297 F.3d at 935, courts construing the somewhat amorphous First Amendment familial association right require allegations that individual defendants were in some way "involved with the decision to" interfere with protected familial associations, *Fitch v. Galland*, No. 1:16-CV-00489-JLT, 2017 WL 1231869, at *5 (E.D. Cal. Jan. 6, 2017).

Critically, Plaintiffs' First Amendment claim against Zwicky is predicated entirely on the allegation that he and his co-conspirators "targeted Sonny [Martinez] based on his familial association with Ray and the associations they perceived Sonny to have that are protected under the First Amendment." (ECF No. 64 ¶ 251.) However, there is no factual allegation anywhere in the FAC tying Zwicky—or any other alleged conspirator—to any personal knowledge of who Mr. Orosco is, let alone what he may have done in the past that would compel the conspirators to decide to falsely accuse and arrest his cousin Martinez. *See Fitch*, 2017 WL 1231869, at *5 (dismissing familial association claim against police officers who removed children from parents' custody after methamphetamine was found in a child's system where there was "no indication that [the officers] were involved with the decision to remove the children"). The statements in the FAC referring to Orosco either contain irrelevant background material, (ECF No. 64 ¶¶ 58–62), relate to his co-location with Martinez at the time of the shooting of Ms. Valadez, (ECF No. 64 ¶¶ 63–68, 88–94), or relate to Orosco's location and belongings during subsequent law enforcement searches, (ECF No. 64 ¶¶ 174, 221, 236). Without more factual detail regarding the individual motivation Zwicky may have had to "target[] Sonny [Martinez] based on his familial association with Ray" as Plaintiffs allege, (ECF No. 64 ¶ 251), it is impossible for the Court to determine whether Zwicky took personal action amounting to an "unwarranted interference" with that familial relationship, *Lee*, 250 F.3d at 686. The same is true of the alleged "associations [Zwicky and his co-conspirators] perceived Sonny [Martinez] to have that are protected under the

First Amendment," because the FAC does not set forth what constitutionally protected associations motivated any law enforcement officers to accuse and arrest Martinez for shooting Ms. Valadez. (ECF No. 64 ¶ 251.)

The Court therefore concludes that Plaintiffs' First Amendment claim against Zwicky is insufficiently specific to make out a valid claim for damages arising from a civil rights violation, because it contains no factual information about Zwicky's "individual participation in the unlawful conduct" of deciding to target Martinez for investigation and prosecution due to his constitutionally protected associations. *Jones*, 297 F.3d at 935.[5] Accordingly, Plaintiffs' First Amendment claim against Zwicky "would also be subject to dismissal," and so granting leave to amend it via the FAC would be futile. *Steckman*, 143 F.3d at 1298. The Court therefore DENIES Plaintiffs' request for leave to amend their First Amendment claim against Zwicky as contained in the FAC, (ECF No. 64).

At the same time, the Court is not convinced that "the pleading could not possibly be cured by the allegation of other facts" because Plaintiffs could allege further details of the personal participation of Zwicky or his co-conspirators in any alleged decision to target Martinez for investigation and prosecution based on his associations, familial or otherwise. *Watison*, 668 F.3d at 1117. Therefore, the Court's denial of leave to amend Plaintiffs' First Amendment claim against Zwicky is without prejudice to bring a subsequent motion for leave to amend that claim.

c.     Third Claim for Relief (Fifth and Sixth Amendments)

Plaintiffs allege that Zwicky, as a member of the "Investigation Team," violated Martinez's Fifth and Sixth Amendment rights by interrogating him without reading him his *Miranda* rights and without his counsel present. (ECF No. 64 ¶¶ 254–57.) Zwicky asserts that the FAC fails to set forth facts alleging Zwicky's personal involvement in the deprivation of Plaintiffs' privilege against self-incrimination and right to counsel. (ECF No. 66 at 6.)

It is beyond dispute that the Fifth Amendment bars a prosecuting authority from using

---

[5]     Nor can the fact that the First Amended Complaint contains conspiracy allegations save Plaintiffs' Second Claim for Relief against Zwicky because the only allegation of any kind that the conspirators knew who Orosco was prior to the events of late October 2015 is that after the alleged conspiracy to target Martinez was agreed to, "Cameron knew Sonny, Jessica, ARM, EVM, and Ray were inside the house asleep, and Plaintiff's truck was parked in front of the house in his view." (ECF No. 64 ¶ 174.)

statements elicited during custodial interrogations of a criminal suspect unless the suspect is first advised of his *Miranda* rights and, if the suspect requests it, provided counsel. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). In the Ninth Circuit, a claim for violation of this Fifth Amendment privilege against self-incrimination may be brought "when government officials use an incriminating statement to initiate or prove a criminal charge." *Stoot v. City of Everett*, 582 F.3d 910, 925 n.15 (9th Cir. 2009). Regarding the Sixth Amendment right to counsel, the Sixth Amendment requires that counsel "be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself." *Farrow v. Lipetzky*, 637 F. App'x 986, 988 (9th Cir. 2016) (quoting *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 212 (2008)).

As Zwicky points out, there are no allegations of any individual actions taken by him personally to interrogate Martinez outside of the generalized claim that a group of which Zwicky was a part, the "Investigation Team," questioned Martinez without his attorney present. (ECF No. 66 at 6.) Standing alone, this is insufficient to establish that Zwicky himself violated Martinez's Fifth or Sixth Amendment rights because the Ninth Circuit "require[s] individual participation, not simply being present or being a member of a team," before liability may attach for violating a plaintiff's civil rights under color of law. *Jones*, 297 F.3d at 937. Unlike the plaintiff in *Ruiz*, 2015 WL 966148, at *5–7, who was hampered in his ability to identify individual officers' conduct because he was not present during their group search of his home, Martinez would have been present when he was interrogated by the "Investigation Team" and so should be able to allege whether Zwicky himself participated in the allegedly unlawful interrogations, (ECF No. 64 ¶ 255). But as they currently stand, Plaintiffs' allegations in their Fifth and Sixth Amendment claim in the FAC amount to no more than assertions that Zwicky was "simply . . . a member of a team" that interrogated Martinez in violation of his constitutional rights. *Jones*, 297 F.3d at 937. *But see Johnson*, 83 F. Supp. 3d at 927 (refusing to dismiss complaint that "alleged that each defendant participated in the raid of [the plaintiffs'] home, held them at gunpoint, handcuffed plaintiffs . . . for thirty minutes or more and held plaintiffs in custody for four hours").

Neither can the fact that Plaintiffs' FAC alleges a civil conspiracy save their Fifth and Sixth Amendment claim against Zwicky. The FAC contains no allegations that one of the conspiracy's common objectives was to violate Martinez's Fifth or Sixth Amendment rights, outside of the conclusory assertion that "[e]verything each of the Investigation Team members did regarding the Alize Valadez shooting investigation after agreeing to disregard the truth was to further the conspiracy and help the object of the conspiracy succeed." (ECF No. 64 ¶ 167.) Standing alone, this is insufficient to establish "the existence of an express or implied agreement among the defendant officers to deprive [Martinez] of his constitutional rights" as specifically guaranteed by the Fifth and Sixth Amendments. *Pelenty*, 588 F. App'x at 624 n.2; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that "a formulaic recitation of the elements of a cause of action will not" satisfy federal pleading standards). This is especially so considering that the FAC *does* contain specific factual allegations that common objectives of the conspiracy included violating Plaintiffs' rights protected by other specifically enumerated constitutional amendments. (*E.g.*, ECF No. 64 ¶¶ 164, 176–200 (allegations that Defendants conspired to violate the Fourth Amendment by falsifying evidence).)

Because Plaintiffs' Fifth and Sixth Amendment claim against Zwicky as alleged in the FAC "would also be subject to dismissal," granting leave to amend it would be futile. *Steckman*, 143 F.3d at 1298. Accordingly, the Court DENIES Plaintiffs' request for leave to amend their Fifth and Sixth Amendment claim against Zwicky as contained in the FAC, (ECF No. 64). At the same time, the Court is not convinced that "the pleading could not possibly be cured by the allegation of other facts." *Watison*, 668 F.3d at 1117. Plaintiffs could allege further facts detailing Zwicky's personal participation in the interrogation of Martinez without his counsel and without knowledge of his *Miranda* rights, or setting forth in more detail the range and scope of the alleged conspiracy to violate Martinez's Fifth and Sixth Amendment rights. Therefore, the Court's denial of leave to amend the Fifth and Sixth Amendment claim alleged against Zwicky is without prejudice to bring a subsequent motion for leave to amend that claim.

d.     Fourth Claim for Relief (Eighth Amendment)

Plaintiffs' Eighth Amendment claim is that Zwicky and his colleagues violated Martinez's

right to be free from excessive bail by misleading the magistrate and the state court handling his criminal case and by concealing exculpatory evidence relating to his arrest for shooting Ms. Valadez, evidence that would have resulted in his immediate release had it been presented to a magistrate.  (ECF No. 64 ¶¶ 260–64, 271–72.)  The gravamen of Plaintiffs' allegations appears to be that because Zwicky and his co-conspirators falsely generated the probable cause to arrest and detain Martinez for the shooting of Ms. Valadez, the fact that any bail at all was set while he was detained pending trial on those charges means that said bail was unconstitutionally excessive.  (ECF No. 64 ¶ 261.)  Zwicky asserts that the FAC fails to set forth facts alleging Zwicky's personal involvement in the deprivation of Martinez's right to be free from having bail set in his criminal case.  (ECF No. 66 at 6.)

Generally, officers are liable for violating the Eighth Amendment where they "deliberately or recklessly misled" the judicial officer who set bail, and where that bail "would not have been unconstitutionally excessive but for the officers' misrepresentations."  *Woolery v. Smith*, No. 17-CV-06786-SK, 2018 WL 3328496, at *3 (N.D. Cal. July 6, 2018) (citing *Galen v. Cty. of L.A.*, 477 F.3d 652, 664 (9th Cir. 2007)).  The Court notes that the portion of the FAC dedicated specifically to Plaintiffs' Eighth Amendment claim does not technically contain sufficiently specific factual allegations against Zwicky because these paragraphs simply allege, *inter alia*, that "the defendants" misled various judicial officers by concealing exculpatory evidence and filing *ex parte* affidavits that omitted material information bearing on Martinez's right to bail.  (ECF No. 64 ¶¶ 261–64.)  Such allegations are, standing alone, insufficient to establish that Zwicky himself violated Martinez's Eighth Amendment rights because the Ninth Circuit "require[s] individual participation, not simply being present or being a member of a team," before liability attaches for violating a plaintiff's civil rights under color of law.  *Jones*, 297 F.3d at 937.

Other allegations elsewhere in the FAC, however, contain specific charges and factual allegations that Zwicky and his law enforcement colleagues "deliberately or recklessly misled" a judicial officer to obtain warrants for Martinez's arrest.  *Woolery*, 2018 WL 3328496, at *3.  Zwicky allegedly took joint action with members of the West Sacramento Police Department to

incorporate materially false information in probable cause affidavits targeted at Martinez. (ECF No. 64 ¶¶ 186, 188.) Indeed, Zwicky himself was the conduit by which Altamirano's false implication of Martinez as Ms. Valadez's shooter was incorporated into the probable cause affidavits sworn out against Martinez. (ECF No. 64 ¶¶ 177–78.) It is reasonable to infer that based on these facts, one of the common objectives of the conspiracy in which Zwicky allegedly engaged was to mislead judicial officers as an indirect means of forcing Martinez to directly or inadvertently confess to shooting Ms. Valadez. (ECF No. 64 ¶¶ 162–69.) It is also reasonable to infer, as the Court must do at this stage in the litigation, *Griggs*, 170 F.3d at 880, that the magistrate reviewing the conspirators' applications for warrants to search Plaintiffs' residence and arrest Martinez would not have found probable cause in the absence of a confession sourced from an informant described by Zwicky as "reliable." (ECF No. 64 ¶ 186.) Read in its entirety, the FAC therefore contains factual allegations setting forth Zwicky's "individual participation in the unlawful conduct" alleged, *Jones*, 297 F.3d at 935, namely, deliberate judicial deception aimed at inducing bail to be set for Martinez that would not have been set "but for the officers' misrepresentations," *Woolery*, 2018 WL 3328496, at *3.

Accordingly, the Court GRANTS Plaintiffs' motion for leave to amend their Eighth Amendment claim against Zwicky via the FAC, (ECF No. 64).

e.      Fifth Claim for Relief (Fourteenth Amendment)

Plaintiffs' Fourteenth Amendment claim is that Zwicky and his fellow conspirators violated Martinez's due process rights by fabricating evidence that led to him being improperly charged with and detained in custody for the shooting of Ms. Valadez, and by depriving him and his family of their reciprocal companionship. (ECF No. 64 ¶¶ 271–300.) Zwicky asserts that the FAC fails to set forth facts alleging Zwicky's personal involvement in the deprivation of Martinez's rights not to have criminal charges filed against him on the basis of false evidence, not to be incarcerated after the conspirators knew or should have known he was innocent, and not to suffer an unwarranted interference with his familial relations. (ECF No. 66 at 6.)

It is "virtually self-evident" that Plaintiffs have a "constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by

the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001). The Fourteenth

Amendment's due process protections are violated where a criminal defendant is incarcerated

after "it was or should have been known that the detainee was entitled to release." *Lee*, 250 F.3d

at 683 (citing *Cannon v. Macon Cty.*, 1 F.3d 1558, 1563 (11th Cir. 1993)). It is also clear that the

Fourteenth Amendment protects Plaintiffs' right to enjoy the companionship and society of their

family members. *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d

450, 458 (9th Cir.) (noting that "freedom of intimate association[ is] protected under the

Substantive Due Process Clause of the Fourteenth Amendment"), *amended by* 881 F.3d 792 (9th

Cir. 2018). To state such a Fourteenth Amendment claim in the context of Martinez's

relationship with his children, Plaintiffs must allege facts showing that Zwicky's actions

"constituted an unwarranted interference" with their right to familial association. *Lee*, 250 F.3d at

686.

Generally, Plaintiffs' Fourteenth Amendment claim against Zwicky would be subject to

dismissal because the Fourteenth Amendment does not apply to federal actors. *See S.F. Arts &*

*Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 543 n.21 (1987) ("The Fourteenth

Amendment applies to actions by a State. The claimed association in this case is between the

USOC and the Federal Government. Therefore, the Fourteenth Amendment does not apply.");

*Taylor v. Donley*, No. CIV S-08-0869 JAM DAD PS, 2010 WL 958067, at *3 (E.D. Cal. Mar. 10,

2010) ("The plain language of the [Fourteenth] amendment reflects that these provisions apply to

states and not to the federal government or its employees."), *report and recommendation adopted*,

No. CIV S-08-0869 JAM DAD PS, 2010 WL 1236327 (E.D. Cal. Mar. 26, 2010). However,

non-state actors ordinarily exempt from the application of the Fourteenth Amendment can

nonetheless be liable where they conspire with state actors whose allegedly unlawful conduct is

governed by that amendment. *See Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) ("A private

individual may be liable under § 1983 if she conspired or entered joint action with a state actor.");

*West*, 128 F. Supp. 3d at 1240 ("Individuals acting under color of federal law may be held liable

under § 1983 only if 'they conspired or acted jointly with state actors to deprive the plaintiffs of

their constitutional rights.'" (quoting *Radcliffe*, 254 F.3d at 783)).

Plaintiffs sufficiently allege the existence of a conspiracy between Zwicky and his co-conspirators to fabricate evidence leading to the filing of criminal charges against and subsequent incarceration of Martinez, and they adequately allege facts describing Zwicky's "individual participation in th[at] unlawful conduct." *Jones*, 297 F.3d at 935. Zwicky himself allegedly knew that Altamirano's account of Martinez's confession was fabricated, (ECF No. 64 ¶ 108–11, 158), but he and his law enforcement cohorts nevertheless chose to use it as a basis for generating probable cause to search and arrest Martinez, (ECF No. 64 ¶¶ 156, 162–64, 178). Furthermore, Zwicky also allegedly agreed to perjure himself by testifying at a preliminary hearing that Altamirano—on whose word the entire case against Martinez at that point rested—was a reliable informant whose account of Martinez's confession was credible. (ECF No. 64 ¶ 299.) Because the criminal case against Martinez depended so heavily on Altamirano's falsehoods, and because it was eventually dismissed for lack of evidence following fifty-three days of his being detained, (ECF No. 64 ¶ 296), it is reasonable to infer that the conspirators—and particularly Zwicky who was or should have been most acutely aware of Altamirano's credibility issues, (ECF No. 64 ¶¶ 105–07)—knew or should have "known that the detainee was entitled to release" during that time, *Lee*, 250 F.3d at 683. That Zwicky knew or should have known that Martinez's detention was without probable cause compels the conclusion that his detention "constituted an unwarranted interference" with his Fourteenth Amendment right to be free to spend time with his family. *Id.* at 685–86.

Accordingly, the Court GRANTS Plaintiffs' motion for leave to amend their Fourteenth Amendment claim against Zwicky as contained in the FAC, (ECF No. 64).

f.     Sixth Claim for Relief (Malicious Prosecution)

Plaintiffs' Sixth Claim for Relief is that Zwicky and his co-conspirators were instrumental in causing Martinez to be maliciously prosecuted for the shooting of Ms. Valadez. (ECF No. 64 ¶¶ 301–06.) Zwicky asserts that the FAC fails to set forth facts alleging Zwicky's personal involvement in the deprivation of Martinez's right to be free from the prosecution to which he was subjected. (ECF No. 66 at 6.)

A *Bivens* claim of malicious prosecution derived from falsified evidence seeks to

40

vindicate rights protected directly by the Fourth Amendment, *see Galbraith*, 307 F.3d at 1126, and a criminal defendant "may maintain a malicious prosecution claim not only against prosecutors but also against others—including police officers and investigators—who wrongfully caused his prosecution," *Smith v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011) (citing *Galbraith*, 307 F.3d at 1126). "[A] police officer's 'false statements and failure to disclose material information to the prosecutor' may support a claim for malicious prosecution." *Johnson v. Brady*, No. CV-14-01875-PHX-DGC, 2015 WL 390794, at *8 (D. Ariz. Jan. 28, 2015) (quoting *Smith*, 640 F.3d at 938). To maintain a *Bivens* action for malicious prosecution, "a plaintiff must show that 'the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her [a] specific constitutional right.'" *Smith*, 640 F.3d at 938 (alteration in original) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)); *see also West*, 128 F. Supp. 3d at 1240 (recognizing *Bivens* claim for "malicious prosecution without probable cause in violation of the Fourth Amendment" against an FBI agent who conspired to use false testimony to implicate, arrest, and prosecute a *Bivens* plaintiff for robbery).

The FAC contains sufficient allegations that Zwicky "wrongfully caused [Martinez's] prosecution." *Smith*, 640 F.3d at 938. These include allegations that Zwicky and his law enforcement colleagues conspired to disregard the lack of evidence tying Martinez to the shooting and to arrest and prosecute him anyway. (ECF No. 64 ¶¶ 162–69.) To achieve the conspiracy's goals, Zwicky told West Sacramento Police Department officers to include misleading information in warrant applications targeted at Martinez. (ECF No. 64 ¶¶ 186–88.) He even went so far as to agree to testify falsely at a preliminary hearing in Martinez's prosecution regarding the reliability of the informant on whom the prosecution's case rested. (ECF No. 64 ¶ 299.) This alleged conduct amounts to generating the kind of false statements that "may support a claim for malicious prosecution." *Johnson*, 2015 WL 390794, at *8. The FAC also contains factual allegations that Zwicky and his co-conspirators engaged in these unlawful acts for the purpose of denying Martinez his "specific constitutional right" not to be arrested without probable cause. *Smith*, 640 F.3d at 938; (ECF No. 64 ¶ 164). Based on these allegations that

Zwicky was personally and integrally involved in generating the evidence that led to Martinez's criminal prosecution, the First Amended Complaint's malicious prosecution claim sets forth Zwicky's "individual participation in the unlawful conduct" alleged of malicious prosecution violative of the Fourth Amendment. *Jones*, 297 F.3d at 935.

Accordingly, the Court GRANTS Plaintiffs' motion for leave to amend their malicious prosecution claim against Zwicky as contained in the FAC, (ECF No. 64).

g.    Seventh Claim for Relief (Abuse of Process)

Plaintiffs' Seventh Claim for Relief is that Zwicky and his coconspirators "intentionally, deliberately, or recklessly abused the affidavit sealing process, continuance process, and other processes in the criminal case [against] Sonny" Martinez, which abuse was a substantial factor in depriving him of his constitutional rights.  (ECF No. 64 ¶¶ 308–09.)

As an initial matter, the Court notes that it remains unclear whether a claim for abuse of process is cognizable in the Ninth Circuit either as a *Bivens* claim or as a claim brought pursuant to 42 U.S.C. § 1983.  *See West*, 708 F. App'x at 292 ("Even assuming an abuse of process claim is cognizable under § 1983 in our circuit . . . .").  Some courts in the Ninth Circuit have suggested that a freestanding abuse of process claim brought pursuant to *Bivens* or pursuant to 42 U.S.C. § 1983 claim, if cognizable at all, "would . . . incorporate the [state law] elements of abuse of process."  *Campbell v. City of Bakersfield*, No. CIV F04-5585 AWI TAG, 2006 WL 2054072, at *21 (E.D. Cal. July 21, 2006); *see also Hunley v. Breceda*, No. CV 02-9106 GHK (AJW), 2010 WL 11582944, at *15 (C.D. Cal. Jan. 4, 2010) ("Analogizing to a section 1983 malicious prosecution claim, it is assumed, for purposes of this analysis, that a section 1983 action for abuse of process can be maintained, and such a claim would incorporate the elements of the tort of abuse of process under California law.").  "To succeed in an action for abuse of process, a litigant must establish that the defendant (1) contemplated an ulterior motive in using the judicial process, and (2) committed 'a willful act in the use of th[at] process not proper in the regular conduct of the proceedings.'"  *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1037 (9th Cir. 2008) (alteration in original) (quoting *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 728 P.2d 1202, 1209 (Cal. 1986)).  Zwicky asserts that the FAC

fails to set forth facts alleging Zwicky's personal involvement in the abuse of process suffered by Martinez. (ECF No. 66 at 6.)

The Court finds that Plaintiffs have alleged sufficiently specific facts that Zwicky played a personal role in the conspiracy to "abuse[] the affidavit sealing process, continuance process, and other processes in the criminal case against Sonny" Martinez. (ECF No. 64 ¶ 308.) The conspirators actuated this alleged abuse of process by including in the probable cause affidavits sworn out against Martinez false information sourced from Zwicky, namely that the informant who implicated Martinez was reliable and that unsealing the affidavits would endanger the informant's life. (ECF No. 64 ¶¶ 185–86.) Knowingly including false statements in a probable cause affidavit submitted to a magistrate constitutes the willful commission of an act "not proper in the regular conduct of the proceedings" of issuing warrants based on probable cause. *Estate of Tucker ex rel. Tucker*, 515 F.3d at 1037; *see also Garcia v. City of Merced*, 637 F. Supp. 2d 731, 751 (E.D. Cal. 2008) (holding that "the obtaining of an arrest warrant by false evidence . . . can amount to abuse of process because an arrest warrant is not to be used for . . . the wrongful arrest and incarceration of an innocent party"). The alleged "ulterior motive" driving this abuse by Zwicky and his co-conspirators, *Estate of Tucker ex rel. Tucker*, 515 F.3d at 1037, was to keep Martinez detained for as long as possible in order to obtain further evidence regarding the shooting of Ms. Valadez, or at the very least to "get[] the streets talking about the arrest and shooting," (ECF No. 64 ¶ 164). Accordingly, the FAC's abuse of process claim sets forth Zwicky's "individual participation in the unlawful conduct" alleged because it is Zwicky who personally supplied the false information incorporated into the misleading probable cause affidavits sworn out against Martinez and subsequently sealed. *Jones*, 297 F.3d at 935.

Accordingly, the Court GRANTS Plaintiffs' motion for leave to amend their constitutional abuse of process claim against Zwicky as contained in the FAC, (ECF No. 64).

## V.    CONCLUSION

The Court orders as follows:

1.    The United States' motion to dismiss, (ECF No. 44), is GRANTED as to

Plaintiffs' Sixth through Fourteenth Claims for Relief in the original Complaint,

1     (ECF No. 1).

2       2.      Plaintiffs' motion for leave to amend their allegations against Zwicky is

3               GRANTED as to the First, Fourth, Fifth, Sixth, and Seventh Claims for Relief as

4               those claims are set forth in the FAC, (ECF No. 64).

5       3.      Plaintiffs' motion for leave to amend their allegations against Zwicky is DENIED

6               without prejudice as to the Second, Third, and Ninth through Eighteenth Claims

7               for Relief as those claims are set forth in the FAC, (ECF No. 64).

8       4.      Zwicky's motion to dismiss the original Complaint, (ECF No. 43), is DENIED as

9               moot.

10       5.      Plaintiffs shall file any further motions to amend their pleading within thirty days

11               of this Order.

12     IT IS SO ORDERED.

13

14   Dated: February 4, 2019

15

16

17                   Troy L. Nunley

18                   United States District Judge

19

20

21

22

23

24

25

26

27

28